Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Block]

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLA CIUFFO, derivatively on behalf of OLAPLEX HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHRISTINE DAGOUSSET, DEIRDRE FINDLAY, TRICIA GLYNN, JANET GURWITCH, MARTHA MORFITT, DAVID MUSSAFER, ERIC TIZIANI, TIFFANY WALDEN, EMILY WHITE, MICHAEL WHITE, JUE WONG, PAULA ZUSI, and ADVENT INTERNATIONAL CORPORATION, <br><br> Defendants, <br><br> and <br><br> OLAPLEX HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Carla Ciuffo ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Olaplex Holdings, Inc. ("Olaplex" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Christine Dagousset ("Dagousset"), Deirdre Findlay ("Findlay"), Tricia Glynn ("Glynn"), Janet Gurwitch ("Gurwitch"), Martha Morfitt ("Morfitt"), David Mussafer ("Mussafer"), Eric Tiziani ("Tiziani"), Tiffany Walden ("Walden"), Emily White ("Emily White"), Michael White ("Michael White"), JuE Wong ("Wong"), Paula Zusi ("Zusi") (together, the "Individual Defendants"), and Advent International Corporation ("Advent") (collectively with Olaplex and the Individual Defendants, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Olaplex, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon Plaintiff's own knowledge and own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Olaplex, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Olaplex's directors and officers from September 29, 2021 through February 28, 2023 (the "Relevant Period").

2.     Olaplex was founded in July 2014 by Dean and Darcy Christal in their Santa Barbara, California garage when the couple, with the help of two chemists from the University of California,

Verified Shareholder Derivative Complaint

designed a compound intended to aid in repairing bonds in hair. In 2015, Olaplex received widespread media attention when celebrity Kim Kardashian publicly stated that she used Olaplex for her hair. Indeed, since Olaplex's origins, the Company has utilized social media influencers and celebrity testimonials to develop a sizeable and active following on social media platforms.

3.     Olaplex is a beauty and cosmetic company that purports to offer "science-backed solutions that are designed to improve hair health." The Company originally offered only three hair products solely to professionals, such as hair salons and professional beauticians. Since then, Olaplex's product offerings have grown considerably; the Company began selling to specialty retail and directly to consumers in the following years while purportedly focusing on addressing three facets of hair care: treatment, maintenance, and protection. Today, Olaplex operates internationally with a sizeable product portfolio that includes fifteen products "specifically developed to provide a holistic regimen for hair health." According to Olaplex, its proprietary, patent protected ingredient, Bis-aminopropyl diglycol dimaleate ("Bis-amino") is a "key differentiator" in the Company's ability to "create trusted, high-quality products."

4.     The Company largely relies on digital marketing for brand-building and sales growth, including extensive direct social media use and third-party social media exposure through celebrity hairstylists and colorists, who serve as "brand ambassadors." Olaplex also utilizes specialty retail stores, such as the French multinational personal care and beauty retailer, Sephora, to build demand through cooperative advertising programs.

5.     To this end, Olaplex markets itself as a brand concerned about customers' health and overall well-being. Indeed, Olaplex has stated that it "strive[s] to produce clean products that exclude certain harmful ingredients."

6.     Four of the Company's products, No. 1, No. 2, 4-in-1 Moisture Mask, and Broad-Spectrum Chelating Treatment are sold exclusively to professionals. Olaplex's No. 3 Hair Perfector, sold under the treatment category, is the Company's best-selling product and is sold directly to consumers.

7.       During the summer of 2019, Defendant Glynn, then serving as managing director of Defendant Advent, a global private equity firm, contacted Defendant Emily White, whom she had known from their service as directors on the board of Lululemon Athletica, Inc., to discuss the possibility of Advent purchasing Olaplex.[1] By November 2019, Defendant Glynn and Defendant Mussafer, who is an Advent senior partner, worked out the parameters of a deal for Advent to buy Olaplex from founders Dean and Darcy Christal.[2]

8.       Advent acquired Olaplex in January 2020 for an undisclosed sum and tapped Defendant Wong to be the Company's Chief Executive Officer ("CEO") and President.[3] In the following months, many salons and professional hair stylists had to shutter their doors due to the onset of the COVID-19 pandemic.[4] In response, Olaplex pivoted from selling products solely to professionals to selling products directly to consumers. To appeal to consumers and drive outreach during the pandemic, Wong expanded Olaplex's social media presence, especially on Tik Tok and Instagram.[5]

9.       Defendant Wong's decision to double down on social media—buoyed by consumers who were largely stuck at home and on their devices more frequently due to the pandemic—was, ***initially***, overwhelmingly successful. Shopping website Cosmetify ranked Olaplex as the "hottest hair brand" in their 2021 Hair Report, with Olaplex enjoying a 73% increase in web searches from 2020 to 2021, 11.3 million Instagram hashtags[6], and over 2 million Instagram followers, which almost doubled the number of Instagram followers second-place Dyson Hair had achieved.[7]

---

[1] "Olaplex Created a $10 Billion Buyout Bonanza, Bloomberg, Feb. 22, 2022, https://www.businessoffashion.com/news/beauty/olaplex-created-a-10-billion-buyout-bonanza/#:~:text=Advent%20International%20led%20the%20purchase,hold%20on%20to%20those%20gains.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] A hashtag is a word or phrase preceded by the symbol # that classifies or categorizes the accompanying text (such as a tweet or an Instagram post). Hashtags are an everyday part of Internet culture, thanks to social media. Originally designed for categorizing posts (i.e., tagging them) on Twitter, hashtags now commonly also supplement or comment on whatever text or image they accompany. The "hash" in hashtag is short for hash mark, a term for what is also called a pound sign. https://www.merriam-webster.com/dictionary/hashtag.
[7] https://www.cosmetify.com/the-hair-report/2021/.

Verified Shareholder Derivative Complaint

10. Armed with a formidable social media following, Olaplex's sales grew 90% in 2020 to $282 million, setting Defendant Advent's sights on a lucrative initial public offering ("IPO") for Olaplex in the near future.

11. In August 2020, the European Union ("E.U.") changed its regulations on cosmetic products to ban butylphenyl methylpropional, a chemical commonly referred to as "lilial." Lilial is often used for fragrance purposes in cosmetic products but has come under scrutiny in recent years as studies have come out associating lilial with infertility and potential harm to reproductive organs.

12. Lilial was part of the formula that constituted Olaplex's best selling product, No. 3 Hair Perfector. Pursuant to the E.U.'s regulation change, Olaplex would not be permitted to sell No. 3 Hair Perfector under its then-in-use formula in the E.U. after March 1, 2022. For this reason, Olaplex decided, in the Spring of 2021, to reformulate No. 3 Hair Perfector to remove lilial from its chemical makeup. Without informing the consuming public or investors, Olaplex reformulated No. 3 Hair Perfector in June 2021 to remove lilial from the product's ingredients. Despite this change, Olaplex chose to continue selling the inventory of the old version of No. 3 Hair Perfector containing lilial to the public until, at least, January 2022, thereby subjecting consumers to significant health risks.

13. On August 27, 2021, Olaplex filed a registration statement with the SEC on Form S-1, which, in combination with a September 20, 2021 amendment on Form S-1/A (declared effective on September 29, 2021 and filed pursuant to Rule 424(b)(4)), was issued in connection with the Company's September 29, 2021 initial public offering (the "Offering") (collectively, the "Registration Statement").

14. On October 1, 2021, the Company filed its final prospectus (the "Prospectus") on Form 424B4 in connection with the Offering, which forms part of the Registration Statement. Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi signed the Registration Statement.

15. On or around September 29, 2021, and just three months after Olaplex clandestinely removed lilial from its best-selling product—yet chose to continue selling its tainted inventory to consumers—the Company initiated the Offering, trading shares of its common stock on the NASDAQ under the ticker symbol "OLPX." Through the Offering, Olaplex sold 84,755,000 shares of Company

common stock at a price of $21 per share for gross proceeds exceeding $1.7 billion. According to Pitchbook, the Offering tripled Advent's initial investment in Olaplex in just two years, making the purchase and IPO of Olaplex "among the most lucrative private-equity transactions in the US."[8] Indeed, after the Offering, Advent held over 578 million shares of Olaplex common stock.

16.     Seeking further profits, Defendant Advent, through Defendants Mussafer, Morfitt, and Emily White, engaged in insider trading by selling 68,711,029 shares of Olaplex common stock at $19.90 per share on October 4, 2021 and unloading another 10,306,655 shares on October 8, 2021 at $19.90 per share, reaping massive proceeds in excess of $1.57 billion, just mere days after the Offering.

17.     The extraordinary profits received by certain of the Individual Defendants from the Offering itself and the massive subsequent insider sales were achieved on false and misleading information while the Company's stock price was significantly artificially inflated due to the Individual Defendants' false statements and omissions. Specifically, the Registration Statement did not notify investors and consumers that Olaplex had removed lilial from No. 3 Hair Perfector and instead made general warnings about the possibility of future risks to the Company's business, such as "international laws, regulations and policies that *could have*[9] an adverse effect on our business…" The Registration Statement further stated that "[a]dditional laws, regulations and policies, and changes, new interpretation or enforcement thereof, that affect our business *could* adversely affect our financial results" and that "[c]hanges *may require us to reformulate* or discontinue certain of our products…" Unknown to investors and the consuming public, Olaplex had already faced these realities months before the Offering, as at that point the E.U. had informed Olaplex of the impending lilial ban, and pursuant to the E.U.'s notices, Olaplex had already removed lilial by reformulating No. 3 Hair Perfector in June 2021 in anticipation of the ban.

18.     Further, the Registration Statement falsely characterized Olaplex's products as "clean" even though the Company's best-selling product had contained lilial, which the E.U. considered a

---

[8] *Supra* at 1. For comparison, it took private equity behemoth Blackstone, Inc.'s acquisition of Hilton Worldwide Holdings, Inc. 11 years to triple its investment.
[9]  All emphasis is added unless otherwise noted.

Verified Shareholder Derivative Complaint

reprotoxic chemical substance.[10] In other words, Olaplex's main product had contained an ingredient that the E.U. determined as potentially causing adverse effects on human fertility, offspring, and overall reproductive functions, as well as causing skin allergies such as scalp irritation and even hair loss. Still, despite being aware of the catastrophic health impacts associated with lilial, the Company continued to sell its lilial-tainted inventory to the public, causing significant harm to unknowing consumers by, *inter alia*, threatening their basic human right to reproduce. Moreover, the Company did not address the issue of lilial or the Company's product reformulation in its public filings or any other public statements until social media ignited a firestorm about No. 3 Hair Perfector's ingredients in early 2022.

19.     Indeed, Olaplex's reliance on social media for marketing and consumer engagement compounded the Company's problems when the truth about No. 3 Hair Perfector's previous formula began to surface in early 2022 on the internet. Specifically, on February 27, 2022, a cosmetic products influencer uploaded a video to Tik Tok that referenced the lilial ban in the E.U. and called into question the safety of Olaplex's products that contained lilial. The video quickly exploded across the internet, causing significant negative publicity for Olaplex. The Company scrambled to salvage its reputation, conducting damage control by posting on social media that No. 3 Hair Perfector had previously contained lilial but that the Company had quietly reformulated the product months earlier without informing their customers or investors. Still, Olaplex's attempts to assure investors and the overall public could not reign in the brand crisis that was enveloping the Company.

20.     Less than a week later, on March 3, 2022, a class of consumers filed a class action lawsuit in Canada, alleging that Olaplex had neglected to inform consumers of the safety risks associated with using No. 3 Hair Perfector due to the presence of lilial. On March 8, 2022, Defendant Wong attempted to assuage investors and analysts that Olaplex had the lilial issue under control; indeed,

---

[10]  The E.U.'s REACh regulation ("Registration Evaluation Authorisation of Chemicals") strives to protect human health and the environment from the potential harms of chemical substances. REACh uses the CLP (Classification, Labelling, Packaging) regulation to promulgate rules for classifying and labelling chemical substances and mixtures. The regulations are based on recommendations from the United Nations. They aim to protect human health in the handling of suspect chemical substances. "Reprotoxic" substances are a category of substances classified as harmful under REACh. Reprotoxic substances are chemicals that, if inhaled, ingested, or absorbed through the skin, could produce or increase the incidence of non-heritable adverse effects on offspring or impair reproductive functions.

in response to a question about whether the negative publicity would impact the Company's product sales, she stated that the Company was "monitoring" "from all angles" and "on all fronts."

21.     Unfortunately for investors, Olaplex's reputation as a business championing healthy and clean living evaporated, along with consumers' trust in the safety of the Company's products, resulting in massive declines in Olaplex's product sales.

22.     Throughout the Relevant Period, Defendants failed to implement adequate internal controls that would prevent false and misleading financial information from being published by the Company in its public disclosures and SEC filings. In particular, the Individual Defendants failed to disclose adverse information regarding the Company's business, prospects, and operations. These inadequate internal controls resulted in the Company's failure to comply with SEC rules and regulations and eventually caused Olaplex's stock price to plummet once the truth emerged, severely damaging the Company itself and shareholders.

23.     Despite having been aware of the Company's plan to remove lilial from No. 3 Hair Perfector as early as June 2021—notably, an entire *three months* before the Offering commenced—the Individual Defendants concealed this reality from investors and the overall public for months and failed to take timely mitigative action, instead making a series of false and misleading statements touting the health of the Company and suggesting that the only routine challenges the Company was facing stemmed from the competitive cosmetic industry itself. Defendants did not disclose, admit, or acknowledge the lilial issue to investors or to the public until May 11, 2022, when the Company revealed in a Form 10-Q filed with the SEC that the Company had reformulated No. 3 Hair Perfector in June 2021 to remove lilial, after public speculation, confusion, and criticism had persisted on social media and news media for months.

24.     On this news, the Company's stock fell $0.78 per share, or 6.03%, from closing at $12.94 per share on May 9, 2022 to close at $12.16 per share on May 10, 2022.

25.     Over the ensuing year, the Company's sales figures dropped significantly, requiring the Company to reduce its financial guidance for the 2022 fiscal year. By the time the truth fully emerged

on February 28, 2023, Olaplex's stock price had tanked, closing at $4.92 per share on February 28, 2023, which was 77% less than its Offering price of $21.00 per share, less than two years earlier.

26.     In breach of their fiduciary duties, the Individual Defendants caused and/or permitted Olaplex to sell products which they knew, or were highly reckless in not knowing, were unsafe. Specifically, Olaplex's No. 3 Hair Perfector: (1) included lilial, an ingredient associated with infertility; (2) included panthenol, a form of vitamin B5 that can trigger allergic reactions and cause contact dermatitis; (3) included non-water-soluble ingredients which can clog hair follicles, resulting in seborrheic dermatitis, and in some instances, even inflammation and hair loss; (4) included sodium benzoate and ascorbic acid, that when combined, form benzene, which is a carcinogen; (5) was quietly reformulated in June 2021 without informing investors or consumers; and (6) was still sold in its original formulation containing lilial for months after June 2021 despite the fact that the Company had reformulated a new version of the product without lilial in June 2021 (collectively, the "Product Safety Misconduct").

27.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Olaplex engaged in the Product Safety Misconduct; (2) as a result of, and as part of, the Product Safety Misconduct, Olaplex faced large risks to its reputation and overall stature in a remarkably competitive industry which was highly reliant on positive social media reviews; and (3) Olaplex failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

28.     In further breach of their fiduciary duties, the Individual Defendants failed to either correct these false and misleading statements and omissions of material fact or to ensure that the

Company had adequate internal controls to affect their disclosure, thus rendering the Individual Defendants personally liable to the Company.

29.     Moreover, three of the Individual Defendants, through their employment and control over Defendant Advent, breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining collective proceeds of over **$1.5 billion**.

30.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and participate and/or facilitate the Company's participation in the Product Safety Misconduct.

31.     In light of the Individual Defendants' misconduct—which has subjected Olaplex, its former CEO, its Chief Financial Officer ("CFO"), its former CFO, and nine current members of its Board of Directors (the "Board") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action") and which has further subjected the Company to the need to remedy the Product Safety Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

32.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

33.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's engagement in the Product Safety Misconduct, of the substantial likelihood of the directors' liability in this derivative action, of the Individual Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Olaplex's Board cannot consider a

demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

35.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

36.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

37.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

38.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Olaplex is headquartered in this District.

## PARTIES

### Plaintiff

39.     Plaintiff is a current shareholder of Olaplex common stock. Plaintiff has continuously held Olaplex common stock since purchasing the stock on October 4, 2021.

### Nominal Defendant Olaplex

40.     Olaplex is a Delaware corporation with its principal executive offices at 1187 Coast Village Road, Suite 1-520, Santa Barbara, California 93108. Olaplex's shares trade on NASDAQ under the ticker symbol "OLPX."

**Defendant Advent**

41.     Defendant Advent is a large private equity firm with principal executive offices at 800 Boylston Street, Suite 3300, Boston, Massachusetts. Since Defendant Advent's founding in 1984, Defendant Advent has invested $78 billion across more than 415 private equity investments in 42 countries. According to the Company's Schedule 14A filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), as of April 15, 2023, Defendant Advent beneficially owned 499,468,711 shares of the Company's common stock, constituting 76.3% of the total outstanding common stock of the Company.[11] Therefore, Defendant Advent is a majority controlling shareholder of Olaplex. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Advent owned approximately $2 billion worth of Olaplex stock as of that date.

42.     Defendant Mussafer has been employed by Defendant Advent since 1990; since before the Offering and continuing to the filing of this complaint, Defendant Mussafer has served as the Chairman and Managing Partner of Defendant Advent. Additionally, Defendant Glynn has been

---

[11] Pursuant to a Schedule 13G filed with the SEC on February 14, 2022, Defendant Advent is composed of the following entities that each hold shares of Olaplex common stock:  (i) 178,649,759 shares held by Advent International GPE IX Limited Partnership, 36,196,850 shares held by Advent International GPE IX-B Limited Partnership, 14,695,785 shares held by Advent International GPE IX-C Limited Partnership, 15,716,152 shares held by Advent International GPE IX-F Limited Partnership, 50,735,073 shares held by Advent International GPE IX-G Limited Partnership, 58,304,526 shares held by Advent International GPE IX-H Limited Partnership, and 32,399,939 shares held by Advent International GPE IX-I Limited Partnership (collectively, the "Advent IX Cayman Funds"), (ii) 53,588,842 shares held by Advent International GPE IX-A SCSp, 11,181,639 shares held by Advent International GPE IX-D SCSp, 23,162,376 shares held by Advent International GPE IX-E SCSp, and 1,232,119 shares held by Advent International GPE IX Strategic Investors SCSp (collectively, the "Advent IX Luxembourg Funds"), and (iii) 943,950 shares held by Advent Partners GPE IX Limited Partnership, 1,369,396 shares held by Advent Partners GPE IX-A Limited Partnership, 5,510,717 shares held by Advent Partners GPE IX Cayman Limited Partnership, 571,802 shares held by Advent Partners GPE IX-A Cayman Limited Partnership, and 15,209,846 shares held by Advent Partners GPE IX-B Cayman Limited Partnership (collectively, the "Advent IX Partners Funds" and, together with the Advent IX Cayman Funds and the Advent IX Luxembourg Funds, collectively, the "Advent Funds"). GPE IX GP Limited Partnership is the general partner of the Advent IX Cayman Funds, GPE IX GP S.à r.l. is the general partner of the Advent IX Luxembourg Funds, and AP GPE IX GP Limited Partnership is the general partner of the Advent IX Partners Funds. Advent International GPE IX, LLC is the general partner of GPE IX GP Limited Partnership and AP GPE IX GP Limited Partnership, and is the sole shareholder of GPE IX GP S.à r.l. Advent International Corporation is the manager of Advent International GPE IX, LLC and may be deemed to have voting and dispositive power over the shares held by the Advent Funds.

employed by Defendant Advent since 2016; she currently serves as a managing partner. Defendant Michael White is also an employee of Defendant Advent, having served as a principal since 2019.

43. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Advent, Mussafer, Morfitt, and Michael White made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|------------|---------------------|----------|
| October 4, 2021 | 68,711,029 | $19.90 | $1,367,212,055 |
| October 8, 2021 | 10,306,655 | $19.90 | $205,081,821 |

Thus, in total, before the fraud was exposed, Defendants Advent, Mussafer, Morfitt, and Michael White sold 79,017,684 shares of Company common stock on inside information, for which Defendants Advent, Mussafer, Morfitt, and Michael White received approximately $1,572,293,876 in proceeds. Their insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates their motive in facilitating and participating in the scheme.

**Defendant Dagousset**

44. Defendant Dagousset has served as a Company director since August 2021 and as the Chair of the Board since August 2021. She also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Dagousset beneficially owned 294,120 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Dagousset owned approximately $1.2 million worth of Olaplex stock as of that date.

45. For the fiscal year ended December 31, 2022 ("Fiscal Year 2022"), Defendant Dagousset received $410,001 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $250,001 in stock awards. For the fiscal year ended December 31, 2021 ("Fiscal Year 2021"), Defendant Dagousset received $115,000 in total compensation from the Company, composed entirely of $115,000 in fees earned or paid in cash.

46. The Company's 2023 Proxy Statement stated the following about Defendant Dagousset:

Christine Dagousset has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Ms. Dagousset had been a member of the Board of Managers of Penelope Group GP since May 2020. Ms. Dagousset is the Global Open Innovation Officer at Chanel, where she develops, strategically evaluates, tests and implements long term business initiatives and builds innovation capabilities for Chanel, including minority investments, to further develop next generation value drivers. Ms. Dagousset previously served as Chanel's Global Long Term Development Officer from 2018 to 2023 and as its Global President of Fragrances and Beauty from 2014 to 2018, leading the operations and strategic direction of this business and developing key business capabilities including marketing, retail, customer relationship management, digital, operations and research and development. Prior to that, she held other leadership roles at Chanel from 1998 to 2014, including General Manager Fragrances and Beauty USA from 2005 to 2014 and Senior Vice President Skincare from 1998 to 2005, after spending a decade at L'Oréal in product development and management roles, including leading Biotherm in Austria. Ms. Dagousset's current directorships include Capsum, a developer of cosmetic innovation technologies, since 2016, and Detox Market, a clean beauty marketplace, since 2018. Ms. Dagousset earned a Marketing Degree from Institut Supérieur de Gestion ISG. We believe Ms. Dagousset is qualified to serve on our Board as she is a results-oriented, strategic thinker with proven success in brand building, global management and product development at a global level. Ms. Dagousset's extensive experience in the beauty industry consistently enables her to provide valuable and current insights to the Board.

**Defendant Findlay**

47.     Defendant Findlay has served as a Company director since August 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Findlay beneficially owned 236,205 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Findlay owned approximately $951,906 worth of Olaplex stock as of that date.

48.     For Fiscal Year 2022, Defendant Findlay received $265,007 in total compensation from the Company. This included $115,000 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Findlay received $103,750 in total compensation from the Company, composed entirely of fees earned or paid in cash.

49.     The Company's 2023 Proxy Statement stated the following about Defendant Findlay:

**Deirdre Findlay** has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Ms. Findlay had been a member of the Board of Managers of Penelope Group GP since September 2020. Ms. Findlay has served as the Chief Marketing Officer of McAfee Corp. since January 2023. Previously, Ms. Findlay served as the Chief Marketing Officer and Head of Consumer Revenue at Condé Nast from 2020

to 2023 and the Chief Marketing Officer of Stitch Fix from 2018 to 2020. Prior to Stitch Fix, she served as Senior Director of Global Hardware Marketing with Google from 2013 to 2018, Senior Director of Consumer Marketing at eBay from 2011 to April 2013, and Senior Vice President of Digitas from 2000 to 2011. Ms. Findlay currently serves on the board of directors of Sonos, Inc. Ms. Findlay holds a B.A. in Economics from Williams College and an M.B.A. from The Tuck School of Business at Dartmouth College. We believe Ms. Findlay is qualified to serve on our Board because of her extensive experience in digital marketing and her consumer insights leadership.

**Defendant Glynn**

50.     Defendant Glynn has served as a Company director since August 2021. She also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Glynn did not directly own any shares of the Company's common stock. However, she is an employee of Defendant Advent which owns 499,468,711 shares of the Company's stock, constituting 76.3% of the total outstanding stock of the Company. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Advent owned approximately $2,012,858,905 worth of Olaplex stock as of that date.

51.     For Fiscal Year 2022, Defendant Glynn received $300,007 in total compensation from the Company. This included $150,000 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Glynn received $37,500 in total compensation from the Company, composed entirely of fees earned or paid in cash.

52.     The Company's 2023 Proxy Statement stated the following about Defendant Glynn:

Tricia Glynn has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Ms. Glynn had been a member of the Board of Managers of Penelope Group GP since January 2020. Ms. Glynn has worked at Advent International Corporation since 2016 where she currently serves as a managing partner, focusing on buyouts and growth equity investments in the retail, consumer and leisure sector. Advent International Corporation is affiliated with the Advent Funds that acquired the Olaplex business in January 2020. Ms. Glynn previously served as a managing director at Advent from 2016 to 2022. Prior to Advent, Ms. Glynn spent 15 years investing across both Bain Capital Private Equity and the Private Equity Group of Goldman, Sachs & Co. She has closed transactions across the retail, healthcare, business services, real estate and media sectors, both domestically and internationally. Ms. Glynn's current directorships include First Watch Restaurant Group, Inc. and Orveon, Inc. She previously served on the board of directors of SavageXFenty from 2021 to 2022, lululemon athletica inc. from 2017 to 2021 and Burlington Stores Inc. from 2012 to 2018. Ms. Glynn earned a B.A. in

Biochemical Sciences cum laude from Harvard College and an M.B.A., with high distinction, as a Baker Scholar from Harvard Business School. We believe Ms. Glynn is qualified to serve on our Board because her experience advising and investing in retail and consumer companies enables her to provide valuable and current insights to our Board.

**Defendant Gurwitch**

53.     Defendant Gurwitch has served as a Company director since August 2021. She also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Gurwitch beneficially owned 1,121,747 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Gurwitch owned approximately $4,520,640 worth of Olaplex stock as of that date.

54.     For Fiscal Year 2022, Defendant Gurwitch received $266,773 in total compensation from the Company. This included $116,766 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Gurwitch received $292,500 in total compensation from the Company, composed entirely of fees earned or paid in cash.

55.     The Company's 2023 Proxy Statement stated the following about Defendant Gurwitch:

Janet Gurwitch has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization (as defined herein under "Transactions with Related Persons – Tax Receivable Agreement"), Ms. Gurwitch had been a member of the Board of Managers of Penelope Group GP, LLC (the "Board of Managers of Penelope Group GP") – the former general partner of Penelope Group Holdings, L.P. ("Penelope Group Holdings"), a former indirect parent of Olaplex, Inc. – since May 2020. Ms. Gurwitch has worked with Advent International Corporation since April 2020 as an advisor focusing on the beauty and wellness sector. Advent International Corporation is affiliated with the Advent Funds that acquired the Olaplex business in January 2020. Prior to Advent, Ms. Gurwitch served as an advisor for Castanea Partners, a Boston-based private equity firm, from 2009 to 2019. In addition, Ms. Gurwitch founded Laura Mercier Cosmetics & Skincare in 1995, where she served as Chief Executive Officer from 1995 to 2008. Prior to founding Laura Mercier, Ms. Gurwitch served as the Executive Vice President of Neiman Marcus from 1992 to 1995. Ms. Gurwitch currently serves on the board of directors of the Houston Astros baseball team. She formerly served on the board of directors of Drybar from 2012 to 2022, Tatcha from 2017 to 2019, First Aid Beauty from 2015 to 2018, and Urban Decay Cosmetics from 2009 to 2012. Ms. Gurwitch earned a B.A. in Retail from the University of Alabama. We believe Ms. Gurwitch is qualified to serve on our Board because of her expertise in the beauty industry and her experience founding, advising and investing in beauty and retail companies.

**Defendant Morfitt**

56.     Defendant Morfitt has served as a Company director since August 2021. She also serves as the Chair of the Audit Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Morfitt beneficially owned 269,205 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Morfitt owned approximately $1,084,896 worth of Olaplex stock as of that date.

57.     For Fiscal Year 2022, Defendant Morfitt received $280,007 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Morfitt received $575,488 in total compensation from the Company. This included $82,500 in fees earned or paid in cash and $492,988 in stock awards.

58.     The Company's 2023 Proxy Statement stated the following about Defendant Morfitt:

Martha (Marti) Morfitt has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Ms. Morfitt had been a member of the Board of Managers of Penelope Group GP since April 2021. Ms. Morfitt is a principal of River Rock Partners, Inc., a business and cultural transformation consulting firm, where she has served since 2008. Additionally, Ms. Morfitt served as the Chief Executive Officer of Airborne, Inc. from 2009 to 2012. Ms. Morfitt also held various positions at CNS, Inc., including President and Chief Executive Officer from 2001 to 2007 and Chief Operating Officer from 1998 to 2001. Prior to that, Ms. Morfitt worked for The Pillsbury Company in a succession of marketing and leadership roles beginning in 1982. Ms. Morfitt currently serves on the board of directors of Graco Inc., a publicly traded fluid handling systems and components company, and as the chair of the board of directors of lululemon athletica inc. She previously served on the board of directors of Mercer International, Inc. from 2017 to 2020 and Life Time Fitness, Inc. from 2008 to 2015. She earned her H.B.A. in Marketing & Strategy from the Richard Ivey School of Business at the University of Western Ontario and an M.B.A. from the Schulich School of Business at York University. We believe Ms. Morfitt is qualified to serve on our Board because of her exceptional knowledge of business and strategy and her vast management experience.

**Defendant Mussafer**

59.     Defendant Mussafer has served as a Company director since August 2021. He also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Mussafer did not directly own any shares of the Company's common stock. However, he is an employee of Defendant Advent which owns 499,468,711 shares of the Company's stock, constituting 76.3% of the total outstanding stock of the Company. Given that the price per share of the

Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Advent owned approximately $2,012,858,905 worth of Olaplex stock as of that date.

60.     For Fiscal Year 2022, Defendant Mussafer received $260,007 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Mussafer received $27,500 in total compensation from the Company, composed entirely of fees earned or paid in cash.

61.     The Company's 2023 Proxy Statement stated the following about Defendant Mussafer:

David Mussafer has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Mr. Mussafer had been a member of the Board of Managers of Penelope Group GP since January 2020. Mr. Mussafer is Chairman and Managing Partner of Advent International Corporation, which he joined in 1990. Advent International Corporation is affiliated with the Advent Funds that acquired the Olaplex business in January 2020. Prior to Advent, Mr. Mussafer worked at Chemical Bank from 1985 to 1988. Mr. Mussafer has led or co-led more than 30 buyout investments at Advent across a range of industries. Mr. Mussafer's current directorships include lululemon athletica inc. and Thrasio. He previously served on the board of directors of First Watch Restaurant Group, Inc. from 2019 to 2021. Mr. Mussafer holds a B.S.M., cum laude, from Tulane University and an M.B.A. from the Wharton School of the University of Pennsylvania. We believe Mr. Mussafer is qualified to serve on our Board because his extensive experience enables him to provide valuable insights regarding board processes and operations as well as the relationship between our Board and stockholders.

**Defendant Tiziani**

62.     Defendant Tiziani has served as the Company's CFO since June 2021. He also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Tiziani beneficially owned 650,090 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Tiziani owned approximately $2,619,863 worth of Olaplex stock as of that date.

63.     For Fiscal Year 2022, Defendant Tiziani received $572,275 in total compensation from the Company. This included $425,000 in salary, $138,125 in bonuses, and $9,150 in all other compensation. For Fiscal Year 2021, Defendant Tiziani received $1,910,208 in total compensation from the Company. This included $245,192 in salary, $185,000 in bonuses, $1,314,216 in option awards, and $165,800 in nonequity incentive plan compensation.

64.     The Company's 2023 Proxy Statement stated the following about Defendant Tiziani:

Eric Tiziani has served as our Chief Financial Officer since August 2021 and has served as the Chief Financial Officer of Olaplex, Inc. since June 2021. Prior to joining Olaplex, Inc., Mr. Tiziani served as a finance leader for over 21 years at Unilever, where he held 11 roles in four countries. Mr. Tiziani has extensive expertise in finance leadership roles, M&A and the beauty industry. Mr. Tiziani served as Chief Financial Officer of Unilever North America from 2018 to 2021, Vice President Finance Unilever Global Beauty & Personal Care and Global R&D in London from 2016 to 2018, Vice President Finance Global Mergers & Acquisitions in London from 2013 to 2016 and Vice President Finance Unilever Canada in Toronto from 2010 to 2013. Mr. Tiziani earned an M.B.A. from Columbia University and a B.A. in Economics from Colgate University.

**Defendant Walden**

65.     Defendant Walden served as the Company's Chief Operating Officer ("COO") and as a Company director from August 2021 until she resigned on October 18, 2022. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Walden beneficially owned 1,038,619 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Walden owned approximately $4,185,635 worth of Olaplex stock as of that date.

66.     For Fiscal Year 2022, Defendant Walden received $1,870,400 in total compensation from the Company. This included $650,000 in salary, $211,250 in bonuses, and $1,009,150 in all other compensation. For Fiscal Year 2021, Defendant Walden received $1,036,669 in total compensation from the Company. This included $650,000 in salary, $130,000 in bonuses, $253,500 in nonequity incentive plan compensation, and $3,169 in all other compensation.

67.     The Schedule 14A the Company filed with the SEC on April 19, 2022 (the "2022 Proxy Statement") stated the following about Defendant Walden:

Tiffany Walden has served as a member of our Board since August 2021 and currently serves as our Chief Operating Officer. Prior to the Pre-IPO Reorganization, Ms. Walden had been a member of the Board of Managers of Penelope Group GP since January 2020. Ms. Walden has deep knowledge of Olaplex, having joined the company in 2016 as our General Counsel, a position she held until 2018, and has since held a variety of roles, including Chief Administrative Officer from 2018 to 2019, Chief Legal Officer from 2018 to August 2021 and Chief Operating Officer, Chief Legal Officer and Secretary from August 2021 to April 2022. Ms. Walden is an integral part of the management team. Prior to her role at Olaplex, Ms. Walden served as Director of Intellectual Property and Senior Counsel at Tory Burch from 2011 to 2016, where she oversaw all intellectual property and brand protection matters for the company. Ms. Walden holds a J.D. from

William & Mary School of Law and a B.A. in Individualized Study with a concentration in Journalism & Business from New York University.

**Defendant Emily White**

68.     Defendant Emily White has served as a Company director since August 2021. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Emily White beneficially owned 23,624,181 shares of the Company's common stock, constituting 3.6% of the total outstanding stock of the Company. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Emily White owned approximately $95,205,449 worth of Olaplex stock as of that date.

69.     For Fiscal Year 2022, Defendant Emily White received $260,007 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Emily White received $27,500 in total compensation from the Company, composed entirely of fees earned or paid in cash.

70.     The Company's 2023 Proxy Statement stated the following about Defendant Emily White:

> Emily White has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Ms. White had been a member of the Board of Managers of Penelope Group GP since January 2020. She has served as President of Anthos Capital, a Los Angeles-based investment firm, since 2018. She spent the last two decades helping build and operate some of technology's most notable companies including Google, Facebook, Instagram and Snapchat. Ms. White served as Snapchat's Chief Operating Officer from 2014 to 2015. Prior to joining Snapchat, Ms. White held several leadership roles at Facebook Inc. from 2010 to 2013, including Director of Local Business Operations, Director of Mobile Business Operations and Head of Business Operations at Instagram. From 2001 to 2010, Ms. White worked at Google, where she ran North American Online Sales and Operations, Asia Pacific & Latin America business and the Emerging Business channel. Ms. White's current directorships include lululemon athletica inc. and Guayakí Yerba Mate, S.P.C. Ms. White previously served on the board of directors of Northern Star Investment Corp. IV from 2021 to 2023, Graco Inc. from 2018 to 2022, Railsbank Technology Limited from 2020 to 2022 and Zayo Group Holdings, Inc. from 2017 to 2020. She has also served on the boards of the National Center for Women in I.T., a non-profit coalition working to increase the participation of girls and women in computing and technology, and X-Prize, a non-profit focused on creating breakthroughs that pull the future forward. She received a B.A. in Art History from Vanderbilt University. We believe Ms. White is qualified to serve on our Board

because of her extensive experience with social networking and technology companies, her understanding of the demographics in which our principal customers reside and the diversity in background and experience she provides to our Board.

**Defendant Michael White**

71.     Defendant Michael White has served as a Company director since August 2021. He also served as a member of the Audit Committee from August 2021 until July 19, 2022, when he ceased serving on the committee due to not meeting NASDAQ independence requirements. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Michael White did not directly own any shares of the Company's common stock. However, he is an employee of Defendant Advent which owns 499,468,711 shares of the Company's stock, constituting 76.3% of the total outstanding stock of the Company. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Advent owned approximately $2,012,858,905 worth of Olaplex stock as of that date.

72.     For Fiscal Year 2022, Defendant Michael White received $258,241 in total compensation from the Company. This included $108,234 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Michael White received $28,750 in total compensation from the Company, composed entirely of fees earned or paid in cash.

73.     The Company's 2023 Proxy Statement stated the following about Defendant Michael White:

> Michael White has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Mr. White had been a member of the Board of Managers of Penelope Group GP since January 2020. Mr. White is a principal at Advent International Corporation and has focused on buyouts and growth equity investments in the retail, consumer and leisure sector since joining Advent in 2019. Advent International Corporation is affiliated with the Advent Funds that acquired the Olaplex business in January 2020. Prior to Advent, Mr. White worked at TPG Capital from 2012 to 2018 and Bain & Company from 2009 to 2012. Mr. White is currently a director at Orveon, Inc. He previously served on the board of directors of First Watch Restaurant Group, Inc. from 2019 to April 2023. Mr. White earned an H.B.A. with distinction and an Ivey Scholar designation from Ivey Business School at Western University and an M.B.A., with distinction, from Harvard Business School. We believe Mr. White is qualified to serve on our Board because of his experience advising and investing in retail and consumer companies.

**Defendant Wong**

74.     Defendant Wong served as the Company's CEO, President, and as a Company director from August 2021 until she resigned on October 12, 2023. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Wong beneficially owned 13,023,617 shares of the Company's common stock, constituting 2% of the total outstanding stock of the Company. Given that the price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Wong owned approximately $52,485,177 worth of Olaplex stock as of that date.

75.     For Fiscal Year 2022, Defendant Wong received $1,334,150 in total compensation from the Company. This included $1,000,000 in salary, $325,000 in bonuses, and $9,150 in all other compensation. For Fiscal Year 2021, Defendant Wong received $1,593,289 in total compensation from the Company. This included $1,000,000 in salary, $200,000 in bonuses, $390,000 in nonequity incentive plan compensation, and $3,289 in all other compensation.

76.     The Company's 2023 Proxy Statement stated the following about Defendant Wong:

JuE Wong has served as a member of our Board and as our President and Chief Executive Officer since August 2021. She has also served as Chief Executive Officer of Olaplex, Inc. since January 2020. Prior to the Pre-IPO Reorganization, Ms. Wong had been a member of the Board of Managers of Penelope Group GP since February 2020. Ms. Wong has extensive experience in scaling business and financial performance for all classes of business from emerging businesses, middle market growth organizations and established/legacy companies. She has strategic and operating expertise in digital and technology-driven platforms of growth. Prior to joining Olaplex, Ms. Wong served as the Global Chief Executive Officer of Moroccanoil Inc. from 2017 to 2019, the President of Elizabeth Arden from 2015 to 2017, and the Chief Executive Officer of StriVectin from 2012 to 2015. Ms. Wong currently serves as a director of Cosmetic Executive Women and Committee of 200 (C200). Ms. Wong earned a B.A. (Honors) in Political Science from the Australian National University. We believe that Ms. Wong is qualified to serve on our Board because of her expertise in the beauty industry and vast management experience.

**Defendant Zusi**

77.     Defendant Zusi has served as a Company director since August 2021. She also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 15, 2023, Defendant Zusi beneficially owned 506,194 shares of the Company's common stock. Given that the

price per share of the Company's common stock at the close of trading on April 14, 2023 was $4.03, Defendant Zusi owned approximately $2,039,962 worth of Olaplex stock as of that date.

78.     For Fiscal Year 2022, Defendant Zusi received $265,007 in total compensation from the Company. This included $115,000 in fees earned or paid in cash and $150,007 in stock awards. For Fiscal Year 2021, Defendant Zusi received $103,750 in total compensation from the Company, composed entirely of fees earned or paid in cash.

79.     The Company's 2023 Proxy Statement stated the following about Defendant Zusi:

Paula Zusi has served as a member of our Board since August 2021. Prior to the Pre-IPO Reorganization, Ms. Zusi had been a member of the Board of Managers of Penelope Group GP since July 2020. In 2015, Ms. Zusi founded Global Retail Advisors, LLC, which provides consulting on supply chain and operational capabilities to companies and investment firms, including Advent International Corporation and some of its portfolio companies. Advent International Corporation is affiliated with the Advent Funds that acquired the Olaplex business in January 2020. Ms. Zusi specializes in driving gross margin improvement, as well as building supply chain and operational capabilities for high growth companies. Previously, Ms. Zusi was the Executive Vice President and Chief Supply Chain Officer at Ann Inc., the parent company of the Ann Taylor and Loft brands, from 2008 to 2014. Prior to joining Ann Inc., Ms. Zusi was the Corporate Vice President at Liz Claiborne, Inc. from 1999 to 2008. Prior to joining Liz Claiborne, Inc., Ms. Zusi held leadership roles in various apparel and retail related companies. Ms. Zusi is currently a board member and former Chairman of the American Apparel and Footwear Association and serves on the Advisory Board of the University of Delaware college of Fashion and Apparel studies. Ms. Zusi earned a B.S. in Fashion and Apparel Studies from the University of Delaware. We believe Ms. Zusi is qualified to serve on our Board because of her more than 30 years of experience in supply chain and operations.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

80.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Olaplex and because of their ability to control the business and corporate affairs of Olaplex, the Individual Defendants owed Olaplex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Olaplex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Olaplex and its shareholders so as to benefit all shareholders equally.

81.     Each controlling shareholder, director, and officer of the Company owes to Olaplex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Olaplex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83.     To discharge their duties, the controlling shareholders, officers and directors of Olaplex were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Olaplex, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Olaplex's Board at all relevant times.

85.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory

filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

86.     To discharge their duties, the officers and directors of Olaplex were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Olaplex were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Olaplex's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Olaplex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Olaplex and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Olaplex's operations would comply with all applicable laws and Olaplex's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.     Each of the Individual Defendants further owed to Olaplex and the shareholders the duty of loyalty requiring that each favor Olaplex's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

88.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Olaplex and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Olaplex, each of the Individual Defendants had access to adverse, non-public information about the Company.

90.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Olaplex.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Olaplex was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

94.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Olaplex and was at all times acting within the course and scope of such agency.

## OLAPLEX'S CODE OF CONDUCT

96.     Olaplex's Code of Conduct states that the Company "will keep integrity, authenticity and respect as core values that shape our business." The Code of Conduct states the following, in relevant part:

> All of the Company's directors, officers and employees as well as the Company's Business Associates are covered by and are expected to comply with this Code. This Code requires all directors, officers, employees and Business Associates to comply with all applicable federal, state, local and foreign laws and regulations, and the provisions of the policies set forth in this Code.

97.     In the same section, the Code of Conduct states that following the law "is only the minimum standard." Olaplex further expects "directors, officers, employees and Business Associates to act ethically by accepting certain responsibilities, adhering to acceptable business principles, and exhibiting a high degree of personal integrity at all times. Directors, officers, employees and Business Associates are expected to be truthful and to conduct themselves with the highest level of integrity in all dealings with coworkers, customers, suppliers, business partners, and the communities in which we operate."

98.     The Code of Conduct further states that Olaplex considers "any violation of this Code to be a serious breach of our trust, and a violation may result in disciplinary action, up to and including termination." Additionally, the Code of Conduct provides that if someone subject to the Code of Conduct is aware of another person violating the Code of Conduct, the individual aware of the violative conduct has "a duty to report the violation, either to our Chief Compliance Officer ('CCO') or a member of our Legal Department, Human Resources Department or through our anonymous hotline."

99.     In a section titled "Global Company," the Code of Conduct states the following:

Because Olaplex has international operations, the laws of a number of different countries may apply depending on the nature and location of our activities. In addition, because Olaplex is based in the United States (the "U.S."), U.S. laws may apply to the conduct of certain of our activities even if such activities occur outside the U.S. Other countries may also apply their own laws outside their borders to their own citizens or to our subsidiaries that are organized under their laws. This Code presents policies that apply worldwide. There may be local policies and practices that discuss in more detail additional requirements pertaining to a particular country or activity.

100.    In another section titled "Public Company Disclosure Obligations," the Code of Conduct provides that "[o]ur business affairs are subject to certain internal and external disclosure obligations and recordkeeping procedures." The Code of Conduct then states the following:

As a public company, we are committed to abiding by our disclosure obligations in a full, fair, accurate, timely and understandable manner. Full, fair, accurate, timely and understandable disclosures in the Company's periodic reports filed with the U.S. Securities and Exchange Commission ("SEC") and in the Company's other public communications is required by SEC rules and is essential to the Company's continued success. Depending on their position with the Company, directors, officers and employees may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. The Company expects all of its

personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements in order to ensure that our books, records, financial statements and disclosures fully and accurately reflect our business and results. In particular, each Senior Executive and Financial Officer is expected to exercise the highest standard of care in preparing such materials.

101.    In the same section, the Code of Conduct states the following, in relevant part:

It is the responsibility of each Senior Executive and Financial Officer to promptly bring to the attention of the internal working group responsible for the review of the Company's periodic SEC reports (the "Disclosure Committee") any information of which he or she may become aware of that materially affects the disclosures made by the Company in its public communications. Each Senior Executive and Financial Officer also shall bring promptly to the attention of the Disclosure Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other directors, officers and employees who have a significant role in the Company's financial reporting, disclosures or internal controls.[12]

102.    In the same section, the Code of Conduct states the following regarding adequately informing investors and the general public:

In addition, Olaplex has a responsibility to properly manage the flow of information to its investors, securities analysts, the media and the general public in a way that ensures the information is disclosed accurately, completely and in accordance with applicable laws and regulations. In order to ensure that Olaplex complies with its obligations, directors, officers and employees receiving inquiries regarding the Company's activities, results, plans or position on public issues should refer the request to the Company's CEO, Chief Financial Officer, Chief Legal Officer or the designated corporate spokesperson. Olaplex directors, officers and employees may not speak publicly for the company unless specifically authorized by senior management.

103.    In a section titled "Record Management," the Code of Conduct states the following, in relevant part:

***Proper, honest, and accurate recording and reporting of information is critical to our ability to make responsible business decisions.*** Our financial statements and the books and records on which they are based must fully, fairly and accurately reflect all corporate transactions and conform to all legal and accounting requirements and our internal accounting control policies and procedures for financial reporting.

---

[12] "Senior Executive and Financial Officers" are defined in the Code of Conduct to include the "Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer), Chief Operating Officer & Chief Legal Officer and the Treasurer and Corporate Controller (and any persons performing similar functions)."

***It is a violation of this Code for any director, officer or employee to knowingly provide false, misleading or inaccurate information, financial or otherwise, to any Company official.*** It is likewise a violation of laws and this Code for any director, officer or employee to take any action to fraudulently or improperly influence, coerce, manipulate or mislead any independent public or certified accountant engaged in the performance of an audit of the Company's financial statements for the purpose of rendering such financial statements materially misleading or any action that could be reasonably expected, if successful, to result in rendering such financial statements materially misleading.

(Emphasis added.)

104.    In another section titled "Insider Trading," the Code of Conduct outlines the definition of insider trading and explains its illegality and prohibition under the Code of Conduct:

Insider trading laws prohibit certain persons who are aware of material nonpublic information about a company or its securities from (i) trading in securities of that company or (ii) providing such material nonpublic information to other persons who may trade on the basis of that information (commonly known as "tipping"). These illegal activities are referred to as "insider trading". Insider trading laws apply not only to trading in Olaplex stock while in possession of material, nonpublic information about the Company, but also to trading in the stock or other securities of any other company while in the possession of material, nonpublic information regarding that company or its securities. Information is considered "material" if there is a substantial likelihood that a reasonable investor would consider that information important in making a decision whether to buy, hold or sell a security. Any information that could be expected to affect the price of a company's securities, whether it is positive or negative, should be considered material. There is no bright-line standard for assessing materiality; rather, materiality is based on an assessment of all of the facts and circumstances, and is often evaluated by enforcement authorities with the benefit of hindsight. Information is considered to be "nonpublic" until the information has been effectively disclosed to the public, for example, in a press release or during an investor conference call. In addition to public disclosure, there must also be adequate time for the investing public to absorb the information.

105.    In a section titled "Conflicts of Interest," the Code of Conduct states "[d]irectors, officers and employees must ensure that their business dealings are never influenced by, or even appear to be influenced by their own personal interests." Later in this section, the Code of Conduct provides that directors and officers "may not directly or indirectly… Participate in activities outside the Company for personal gain that are in conflict with the Company's best business interests."

106.    In a section titled "Corporate Assets," the Code of Conduct states that "[d]irectors, officers and employees should protect the Company's assets and their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability."

### Audit Committee Charter

107.    The Olaplex Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee, stating that the Audit Committee "shall oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements."

108.    Per the "Purpose" section of the Audit Committee Charter, the Audit Committee is tasked with the following responsibilities:

- assisting the Board in its oversight and, as applicable, approval of (i) the integrity of the consolidated financial statements of the Company, (ii) the independent auditor's qualifications and independence, (iii) the performance of the Company's independent auditors and the Company's internal audit function, (iv) the Company's internal control over financial reporting, (v) the Company's compliance with legal and regulatory requirements, (vi) related party transactions, and (vii) the Company's policies, procedures and practices with respect to risk management and mitigation, including the Company's risks related to information security, cyber security and data protection;

- determining whether to appoint, retain or terminate the Company's independent auditors and to pre-approve audit, audit-related, tax and other services, if any, to be provided by the independent auditors; and

- preparing the report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement, including the disclosure required by Item 407(d)(3)(i) of Regulation S-K.

109.    Under the same section, the Audit Committee Charter states that the Audit Committee shall do the following:

Consistent with the Audit Committee's oversight role, the Audit Committee should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels. The Audit Committee should also provide for open communication among the independent auditor, financial and senior management, the Company's internal audit function and the Board. The Audit Committee shall engage in such activities as are necessary or appropriate for it to render an annual report of the Audit Committee that meets applicable regulatory requirements.

110.    In a section titled "Financial Statements, Earnings Releases and Guidance," the Audit Committee Charter states that the Audit Committee has the following responsibilities, in relevant part:

- The Audit Committee shall meet to review and discuss with management and the independent auditor the annual audited financial statements, including reviewing, to the extent applicable, specific disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in any Annual Report on Form 10-K, and recommend to the Board whether the audited financial statements should be included in any Annual Report on Form 10-K required to be filed by the Company with the SEC.

- The Audit Committee shall meet to review and discuss with management and the independent auditor the quarterly financial statements, including reviewing, to the extent applicable, specific disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in any Quarterly Report on Form 10-Q, and the results of the independent auditor's review of the quarterly financial statements, prior to the filing of any Quarterly Report on Form 10-Q required to be filed by the Company with the SEC.

- The Audit Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding, or call into question the integrity of, the Company's financial statements or accounting policies.

111.    In a section titled "Controls and Procedures," the Audit Committee Charter describes the following responsibilities of the Audit Committee, in relevant part:

- Internal Controls and Internal Controls Report. The Audit Committee shall review and discuss with management, the Company's senior internal auditing executive and the independent auditor the adequacy of the Company's internal controls, any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies and, to the extent applicable, the Company's internal controls report and the independent auditor's internal controls report prior to the filing of any Annual Report on Form 10-K or any Quarterly Report on Form 10-Q required to be filed by the Company with the SEC.

- Disclosure. The Audit Committee shall review disclosures about any significant deficiencies or material weaknesses in the design or operation of internal controls and any fraud involving management or employees playing a significant role in the Company's internal controls made to the Audit Committee by the Company's chief executive officer and chief financial officer, including, to the extent applicable, any disclosures made during their certification process for any Annual Report on Form 10-K or any Quarterly Reports on Form 10-Q required to be filed by the Company with the SEC.

- The Audit Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.
- Ethics and Compliance. The Audit Committee shall oversee the Company's ethics and compliance functions, including the Company's Code of Conduct and Ethics and other procedures established by the Company with regard to ethical behavior, avoidance of conflicts of interest and other related matters.

- Legal and Regulatory Matters. The Audit Committee shall oversee the Company's compliance with legal and regulatory requirements and confer with the Company's General Counsel about legal matters that may have a material impact on the financial statements or the Company's compliance policies. The Audit Committee also shall:

  o at least annually, receive a presentation by management summarizing the Company's programs and control for compliance with legal and regulatory requirements;

  o review and discuss with management and the Company's internal audit function the Company's procedures and practices designed to provide reasonable assurance that: (i) the Company's books, records, accounts and internal accounting controls are established and maintained in compliance with the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and similar laws and regulations to which the Company is subject, and (ii) there are adequate company level controls in place to prevent or detect (A) any improper or illegal disbursement of corporate funds or property of value or (B) the making of any arrangement on behalf of the Company that may provide for or result in the improper or illegal disbursement of funds or property of value, in order that the Company be in compliance with such laws and regulations; and

  o at least annually, review and approve decisions by the Company and any of its subsidiaries to enter into (i) interest rate swaps or security-based swaps (together referred to as "swaps") transactions, as defined by the Dodd-Frank Wall Street Reform and Consumer Protection Act and subsequent regulations (the "Dodd-Frank Act"), including decisions to enter into swaps transactions that are exempt from the mandatory execution and clearing requirements under the Dodd- Frank Act, (ii) hedging transactions, (iii) interest rate cap transactions or (iv) fixed term debt transactions, or any amendments to the foregoing.

112.   The Individual Defendants violated the Code of Conduct by engaging in or permitting the schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty by engaging in or

effectuating the Product Safety Misconduct, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Conduct, three of the Individual Defendants engaged in insider trading while the Company's stock was trading at artificially inflated prices. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

113.    Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty by engaging in or effectuating the Product Safety Misconduct, unjust enrichment, waste of corporate assets, and violations of the Exchange Act and the Securities Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Olaplex's Background

114.    Olaplex's brand is based upon the repair and protection of hair from damage triggered by chemical hair treatments, heat styling, and stress from the environment. Olaplex was founded in July 2014 by Dean and Darcy Christal in their Santa Barbara, California garage when the couple, with the help of two chemists from the University of California, designed a compound intended to aid in repairing bonds in hair. The Company originally offered only three hair products solely to professionals, such as hair salons and beauticians. Since then, Olaplex's product offerings have grown considerably; the Company began selling to specialty retail and directly to consumers in the following years while purportedly focusing on addressing three facets of hair care: treatment, maintenance, and protection. Today, Olaplex operates internationally with a sizeable product portfolio that includes fifteen products, which the Company represents were "specifically developed to provide a holistic regimen for hair

health." According to Olaplex, its proprietary, patent protected ingredient, Bis-amino is a "key differentiator" in the Company's ability to "create trusted, high-quality products." Olaplex's patented bis-amino compound is used in the Company's premium haircare products including shampoo, conditioner, and leave-in hair treatments and is intended to protect and rebuild broken hair bonds in hair fibers that suffered damage from natural and chemically induced wear and tear.

115.    As mentioned above, Olaplex divides itself into three divisions: (1) Professional; (2) direct to consumer ("DTC"); and (3) Specialty Retail. These three divisions each accounted for about 55%, 27%, and 18% of Olaplex's 2020 sales, respectively. The Professional division, launched in 2014, sells products to commercial salons and beauticians so that hairstylists can use Olaplex products on clients, and in turn, sell Olaplex products to their clients for personal use. The Company designed the Professional division after conducting research which determined that consumers often bought haircare products that their hairstylists and beauticians recommended. Olaplex utilizes SalonCentric and Beauty Systems Group to distribute Olaplex products in the Professional division. The products sold in the Professional division are not sold in the DTC or Specialty Retail divisions. The Specialty Retail division, launched in 2018, sells Olaplex products to large cosmetic retailers like Sephora and Ulta Beauty. When Olaplex hit Sephora shelves in 2018, it became the fastest growing haircare brand in the retailer's history. Moreover, the DTC division, also launched in 2018, sells products directly to consumers through Olaplex's website, Amazon, and other third-party sellers.

116.    Although the three divisions operate separately, they are interdependent and intertwine each other. Olaplex maintains that its "professional, specialty retail, and DTC channels create[] a powerful feedback loop that reinforces consumer spending across channels." For instance, consumers frequently purchase Olaplex products from Sephora (a specialty retailer) after listening to recommendations from their hair stylist.

117.    Four of the Company's products—No. 1 Bond Multiplier, No. 2 Bond Perfector, 4-in-1 Moisture Mask, and Broad-Spectrum Chelating Treatment—are sold exclusively in the Company's Professional division, meaning these products can only be obtained by consumers after consulting with a hairstylist or beautician. In contrast, Olaplex's best-selling product—No. 3 Hair Perfector—is sold to

consumers directly from the DTC and Retailer divisions through the Olaplex website and a variety of other mediums.

### No. 3 Hair Perfector's Vital Importance to Olaplex

118.    Before and during Olaplex's Offering, the Individual Defendants maintained that the Company's rapid growth was due to brand awareness, distribution across all three divisions, international sales growth, and a larger product portfolio. For example, the Registration Statement boasted that the Company's "dedication to providing science-driven solutions" drove "community engagement that has fostered loyalty among the consumer community." Additionally, Olaplex's relationships with specialty retailers such as Sephora and Ulta Beauty were vital to the Company's rapid growth and product distribution.

119.    No. 3 Hair Perfector is a pre-shampoo treatment intended for repair and prevention of hair damage. Throughout the Relevant Period, the Individual Defendants represented that No. 3 Hair Perfector was the most important product in the Company's portfolio. For instance, during a March 8, 2022 earnings conference call, Defendant Wong stated that No. 3 Hair Perfector was "the best-selling prestige hair product" in the U.S. in 2021, "[a]ccording to the NPD Group retail tracking data[.]" Similarly, in a February 23, 2023 earnings conference call, Defendant Wong depicted No. 3 Hair Perfector as Olaplex's "hero SKU" and as one of Olaplex's "core products." She further stated that Olaplex would "anchor" its marketing around No. 3 Hair Perfector, that the product had "been very successful" in the past, and that "No. 3 need[ed] to remain top of mind" for consumers. Similarly, multiple analysts have previously characterized No. 3 as Olaplex's "best seller" and "best-selling" product.[13] Likewise, fashion news media, such as *Vogue Business*, reported that No. 3 was vital to Olaplex's business, noting that "Olaplex's success has been driven by focusing on less than 10 [at that time] very effective products ***with No. 3 among its best sellers***."[14]

---

[13] Raymond James analyst report from October 25, 2021 and J.P. Morgan report in November 21, 2022 analyst report.

[14] Kati Chitrakorn, After viral infertility memes, can Olaplex bounce back?, Vogue Business (June 22, 2022), https://www.voguebusiness.com/beauty/after-viral-tiktok- infertility-memes-can-olaplex-bounce-back.

120.    Due to Olaplex's small product portfolio, which focuses solely on haircare, the Company is vulnerable to heightened risks associated with maintaining consumer demand. For instance, in an October 25, 2021 J.P. Morgan analyst report, analysts stated: "Risks to Rating and Price Target – Lack of Business Diversification: OLPX currently operates with one brand (Olaplex) in one category (haircare). *As such, any damage to the equity of the brand* or a sudden deceleration in consumer demand for hair products *could have a disproportionately larger impact on OLPX's sales compared to beauty peers* (most of which generally operate with multi-brand portfolios in multiple categories)." Therefore, fostering and keeping a positive brand reputation was especially vital to Olaplex's success.

### *Olaplex Builds Clean & Health-Conscious Brand*

121.    A large part of Olaplex's brand building both before, during, and after the Offering involved marketing the Company to the public and investors as a "clean" company that sold products without any harmful toxins and was concerned with consumers' health. For instance, Olaplex has depicted itself as "*proud to be non-toxic*, cruelty-free, and *free of all beauty industry toxins*." Indeed, Olaplex's website states that the Company's "*mission is to inform and keep your health front and center*." Moreover, the Registration Statement stated that "[t]hese efforts are well recognized in the industry, with OLAPLEX being one of only 21 haircare brands accredited with the 'Clean at Sephora' designation, as of July 31, 2021." The "Clean at Sephora" designation signifies that a product is made without parabens, sodium lauryl sulfate and sodium laureth sulfate, phthalates, mineral oils, formaldehyde, and other such toxic ingredients or allergens that are associated with numerous health and safety risks, and, in result, restricted or banned by the E.U. Olaplex's website further maintains its products are "free of many common allergens."

122.    All of these representations led the investing public and the consuming public to believe throughout the Relevant Period that Olaplex was a scientifically driven, clean, and health-concerned company that operated in an open fashion.

### *Olaplex Utilizes Influencers and Social Media to Cultivate its Brand, Making the Maintenance of a Positive Online Presence Integral to the Company's Success*

123.    As previously stated, Olaplex is largely regarded as holding a patent for its bond-building formula that allegedly aids in the restoration and strengthening of hair. The Company relies on digital marketing for brand-building and sales growth, including extensive direct social media use and third-party social media exposure through celebrity hairstylists and colorists, who serve as "brand ambassadors."

124.    Per the Registration Statement, "the OLAPLEX hashtag has been used over 12.3 million times across social media platforms by [its] community of professional hairstylists and consumers." The Registration Statement also boasted about Olaplex's social media power by stating that Olaplex is a "[b]eloved [b]rand with [p]assionate and [l]oyal [c]onsumer [f]ollowing." The Registration Statement also stated that Olaplex's "passionate consumer base" extends to Tik Tok as well, noting the following:

> Our dedication to providing science-driven-solutions has created an engaged consumer base that we believe advocates authentically for the quality of our products. Our unique relationship with stylists and active involvement with them through digital forums, OLAPLEX Pro App and as brand ambassadors has driven community engagement that has fostered loyalty among the consumer community as well. We continue to build loyal relationships with elite hairstylists and brand ambassadors who educate our consumers, test our products, participate in our brand campaigns and introduce our products to their clientele. Our brand ambassadors also have leadership influence and reach throughout the hairstylist community which reinforces our brand positioning.
>
> ***
>
> *Furthermore, our consumers have continued to engage with the OLAPLEX brand online.* As of August 31, 2021, *the OLAPLEX hashtag has been used over 12.3 million times across social media platforms by our community of professional hairstylists and consumers* who create their own content about their haircare regimen. In the past year, we had exceptional engagement with our Instagram community of over 2 million followers as of July 31, 2021, which generated over 2.4 million likes and an average of approximately 13,000 story views a day. *Our passionate consumer base is also demonstrated by our presence on TikTok where our videos have been viewed over 1.5 million times* between April and September 2021, and, as of September 2021, videos using the OLAPLEX hashtag have been viewed over 350 million times since the hashtag first appeared on the platform.

125.    The Registration Statement also stressed that the Company's "exceptional social media engagement" aids its "strong track-record of successful product launches." For instance, when Olaplex's No. 0 product was the #1 selling SKU at Sephora during the weeks after it launched, Olaplex attributed this success to "exceptional social media engagement[.]"

126. The Registration Statement stated that atop Olaplex's "Growth Strategies" was "Grow Brand Awareness." To accomplish this goal, the Company represented that it would bolster its social media presence to power brand awareness and aid in future growth, stating the following:

> As of July 31, 2021, our powerful digital community include[d] more than 100 brand advocates, including licensed cosmetologists supporting our content creation, two professional-dedicated communities on social media consisting of over 230,000 hairstylists and several company- operated accounts including in Instagram, TikTok, Facebook and other social media platforms, where we have demonstrated robust followership and engagement. . .. We plan to continue to grow our social media engagement by increasing our digital marketing spend and expanding our capabilities to interact with our consumers through OLAPLEX.com and other digital channels.

127. Investors and analysts grabbed onto Olaplex's representations about its social media efforts to build the Company's brand. On October 25, 2021, Barclays reported that Olaplex's "digital community" distinguished the Company from its competitors, writing that "the way Olaplex engages with and supports the professional stylist community is highly differentiated versus other professional hair care brands." The report further stated that the "digital community" includes "dedicated brand advocates, including licensed cosmetologists supporting content creation, two professional-dedicated communities on social media consisting of over 230,000 hairstylists and several company-operated accounts including on Instagram, TikTok and Facebook." Regarding Olaplex's "Olaplex Users" Facebook group page, the Barclays analyst report stated that it was the "the largest social media network community for hairstylists, consisting of 145K members, with ~12% of all stylists in the U.S. as members and 25% of users engaging daily."

128. Another analyst report from Piper Sandler, published that same day, stated that "growing brand awareness" was among the "biggest drivers of growth for OLPX." Similar to Barclays' praises, Piper Sandler's report stated that the Company's "superior social media presence vs. competitors (highest EMV[15] among haircare providers)" was a key factor supporting the Company's "[s]trong [c]ompetitive [p]ositioning" and "[n]ice [g]rowth [t]rajectory." The Piper Sandler report further stated

---

[15] Piper Sandler's analyst report defined EMV as "earned media value." EMV tracks "engagement, or media buzz, with social media content that's related to a brand and created by a third party, such as an influencer."

that analysts compared "the top 5 haircare brands from an EMV standpoint" and evaluated "how each compares on various media engagement platforms and web traffic." Piper Sandler determined that "Olaplex is the clear leader, having 2.2M Instagram followers, 86.9K TikTok followers, 1.2M web visits to olaplex.com, and an average Google search ranking[16] over the last twelve months of 72/100."

129. A Telsey analyst report from the same day, October 25, 2021, stated that "Olaplex markets through a community of eight celebrity stylists (as of June 2021), referred to as brand ambassadors. Collectively, this influential group has over 4.5 million Instagram followers, with client rosters including Jennifer Aniston, Jennifer Lopez, Selena Gomez, and Gwyneth Paltrow." Echoing Barclays and Piper Sandler, Telsey stated that "Olaplex's growth strategy depends on increasing brand awareness" and that this growth strategy was first among Olaplex's "[f]ive key growth strategies." Telsey's report further stated that a "highly engaged digital community" was important to "continue to drive awareness" of Olaplex's brand, writing that "[t]his community is comprised of over 100 brand advocates, two professional-dedicated social media communities (over 230,000 stylists), and multiple company-operated Instagram, TikTok, and Facebook accounts." Telsey also discussed the importance of Olaplex's "brand building" in the future:

> Social media has enabled disruption throughout the beauty industry, in terms of: 1) proliferation of new brands; 2) importance of user-generated content (i.e., influencers and micro-influencers); and, 3) direct communication with consumers. ***Given the visual nature of the beauty industry, Instagram, Facebook, YouTube, and TikTok are powerful channels.*** How-to clips, before-and-after photo compares, and product comparisons are all continuously delivered in a steady stream of content. ***Olaplex leverages the power of social media to its benefit***, partnering with influencers (both celebrity stylists and micro-influencers) to spread the word and power of its products. ***We anticipate Olaplex continuing to successfully leverage all platforms*** as a form of engagement, ***brand building***, and communication.

130. The Individual Defendants continued to emphasize Olaplex's brand awareness and social media engagement well after the Offering. For instance, in a November 10, 2021 earnings call,

---

[16] Google search rankings show the chance of a website appearing on a Google search. In other words, the better the search ranking, the higher the likelihood that a website would appear to a larger population.

Defendant Wong told investors about Olaplex's commitment to building its brand in the social media space, stating:

> I think, what is important to note is, ***we are very focused on what really builds long-term growth***, and when studies have shown us that the three sources of truth, ***when it comes to brand building and marketing awareness***, first and foremost, is the – is – especially for hair, is where they want to take recommendations from their professional hair stylist. So building that community will continue to be our focus.
>
> So with that said, the #2 area, the #2 source of truth, is product reviews and word of mouth, which is the third one, ***which means that we are already in that space through our social media engagement connection and conversion, with our performance marketing, whether it's via digital media or search engine optimization.***
>
> We will continue all of this interactive tools to connect, engage and convert our customers. And if we continue to do that, the marketing, branding and the awareness build would just be a lot more organic as well as strategic because this is in partnerships, not only with what we are doing, but driving traffic to both online and offline retailers that we partner with.
>
> ***
>
> I think, first and foremost, if you look at the Professional Beauty Association data, they will let you know that there are 800,000 professional health stylers, as registered with them. And we have well over 250,000 that is in a constant engagement and connection with us on our Facebook group, meaning that they are interacting with us. They are engaging with us. They are producing content for us. ***So we feel very strongly that, that continuous community built, will continue to serve us very well.***

131.   In all, investors and analysts were convinced that Olaplex's success was highly dependent upon a positive brand reputation in the social media sphere across the internet. Indeed, robust and positive social media buzz about Olaplex's products could raise sales and spread brand awareness at lightning speed. However, Olaplex's reliance on social media made the Company overly vulnerable to poor social media chatter as well, which had the unfortunate capability of destroying Olaplex's brand reputation and eviscerating market value with remarkable speed.

### *Olaplex's IPO Deal Takes Shape*

132.   During the summer of 2019, Defendant Glynn, then serving as managing director of Defendant Advent, a global private equity firm, contacted Defendant Emily White, whom she had known from their service as directors on the board of Lululemon Athletica, Inc., to discuss the possibility of Defendant Advent purchasing Olaplex.[17] By November 2019, Defendant Glynn and

---

[17]   "Olaplex   Created   a   $10   Billion   Buyout   Bonanza,   Bloomberg,   Feb.   22,   2022,

Defendant Mussafer, a senior partner at Defendant Advent, had worked out the parameters of a deal for Defendant Advent to buy Olaplex from founders Dean and Darcy Christal.[18]

133. Defendant Advent acquired Olaplex in January 2020 for an undisclosed sum and tapped Defendant Wong to be the Company's CEO and President.[19] In the following months, many salons and professional hair stylists had to shutter their doors due to the onset of the COVID-19 pandemic.[20] In response, Olaplex pivoted from selling products solely to professionals to selling products directly to consumers. To appeal to consumers and drive outreach during the pandemic, Defendant Wong expanded Olaplex's social media presence, especially on apps like Tik Tok and Instagram.[21]

134. Defendant Wong's decision to double down on social media, buoyed by consumers largely stuck at home and on their devices more frequently due to the pandemic, was, ***initially***, overwhelmingly successful. Indeed, shopping website Cosmetify ranked Olaplex as the "hottest hair brand" in their 2021 Hair Report, with Olaplex enjoying a 73% increase in web searches from 2020 to 2021, 11.3 million Instagram hashtags, and over 2 million Instagram followers, which almost doubled the number of Instagram followers second-place Dyson Hair achieved.[22]

135. Armed with a formidable social media following, Olaplex's sales grew 90% in 2020 to $282 million, setting Defendant Advent's sights on a lucrative IPO in the near future.

136. On August 27, 2021, Olaplex filed the Registration Statement with the SEC, which was later amended on September 20, 2021 and declared effective on September 29, 2021.

137. On or around September 29, 2021, Olaplex held the Offering, wherein the Company sold 84,755,000 shares of Company common stock at a price of $21 per share. In connection with the sale of the 84,755,000 shares of Company common stock, Defendant Advent's and non-party Mousse Partners'

---

https://www.businessoffashion.com/news/beauty/olaplex-created-a-10-billion-buyout-bonanza/#:~:text=Advent%20International%20led%20the%20purchase,hold%20on%20to%20those%20gains.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] https://www.cosmetify.com/the-hair-report/2021/.

combined previous ownership in Olaplex would be reduced from 96.1% to 83% in exchange for proceeds from the Offering totaling $1,686,412,612.50.

138.    According to Pitchbook, the Offering tripled Advent's initial investment in Olaplex in just two years, making the purchase and IPO of Olaplex "among the most lucrative private-equity transactions in the US."[23] Indeed, after the Offering, Advent held over 578 million shares of Olaplex common stock.

### *Product Safety & Domestic and International Law Compliance*

139.    The U.S. is Olaplex's largest market, representing about 56% of the Company's sales in 2022, while the international market, spanning more than 100 countries, makes up the 44% remainder. Most of Olaplex's international market is located in western Europe—namely, countries that are member states of the E.U. or the United Kingdom ("U.K."). As a result, Olaplex must not only abide by U.S. law, but also various international laws, including the E.U.'s laws and regulations addressing the production and sale of cosmetics.

140.    In the U.S., the U.S. Food and Drug Administration ("FDA") is the primary entity tasked with securing public health through monitoring and regulating food, drugs, and cosmetic products, among other things. In other words, the FDA is responsible for regulating Olaplex's haircare products, as they are classified as cosmetic products. The FDA has two regulations that address cosmetic manufacturers and sellers: (1) the Food, Drug, and Cosmetic Act ("FDCA"); and (2) the Fair Packaging and Labeling Act ("FPLA").

141.    The FDCA is intended to prevent false advertising and the misbranding of products by ensuring that product labels contain true, complete, and accurate information. To this end, the FDCA requires certain product packaging and labeling requirements such as mandating that the manufacturer's name and business location be printed on the product's label as well as directions for the product's correct use.

---

[23] *Supra* at 1. For comparison, it took private equity behemoth Blackstone, Inc.'s acquisition of Hilton Worldwide Holdings, Inc. 11 years to triple its investment.

142.    The FPLA is also intended to ensure the accuracy of product labeling, but specifically focuses on the disclosure and listing of ingredients on product labels. The FPLA gives the FDA authority to create regulations to ensure that manufacturers accurately represent their products to the consuming public.

143.    However, despite the presence of the FDCA and the FPLA, cosmetic manufacturing companies, like Olaplex, do not need to obtain FDA approval before designing and selling cosmetic products. In other words, cosmetic companies like Olaplex are largely left to their own devices when putting products in the marketplace in the U.S. For this reason, the U.S. consuming public almost exclusively relies upon cosmetic companies themselves to design and sell products safe for human health and overall use.

144.    The Occupational Safety and Health Administration ("OSHA") also regulates cosmetic companies, including Olaplex, by regulating workplace safety. To this end, OSHA establishes rules and regulations that require manufacturers to inform their workers that exposure to certain chemicals or ingredients in the manufacturing of consumer products could be harmful to human health. For instance, OSHA mandates that manufacturers furnish Safety Data Sheets to workers who handle potentially hazardous chemicals or other ingredients.[24] However, like the FDA's leaky oversight of cosmetic products, OSHA's is primarily concerned with manufacturing safety, not subsequent consumer safety after the manufacturer's products are sold in the public marketplace.

145.    Due to this haphazard regulatory framework in the U.S., much regulatory enforcement occurs *after* defective or dangerous products have already brought to market, either by product recall or outright product bans. This approach differs greatly from the hands-on approach to cosmetic products regulation frequently taken internationally, especially in the E.U.

146.    Indeed, the E.U. has banned more than 2,500 chemicals from cosmetic products in its history; to compare, the U.S. has only banned approximately 11. To this end, the E.U. has become the

---

[24] OSHA's Hazard Communication Standard (29 CFR 1910.1200) states that "If the chemical manufacturer, importer or employer preparing the safety data sheet becomes newly aware of any significant information regarding the hazards of a chemical, or ways to protect against the hazards, this new information shall be added to the safety data sheet within three months."

global leader in food, drug, and cosmetic products regulation, which has spurred companies, both internationally and in the U.S., to raise their standards to comply with E.U. guidance.

### The E.U. Moves to Ban Lilial in 2020

147.     Pursuant to the Classification, Labelling and Packaging Regulation ("CLP") ((EC) No 1272/2008), the E.U. holds the power to ban chemicals from consumer products. The CLP mandates that cosmetic product manufacturers and sellers, such as Olaplex, properly classify, label, and package harmful chemicals before putting products that contain harmful chemicals into the marketplace.

148.     The E.U. primarily designs its regulations by consulting the E.U. Commission for the Scientific Committee on Consumer Safety's ("SCCS") research findings. The E.U. tasks SCCS with answering "questions concerning health and safety risks (notably chemical, biological, mechanical and other physical risks) of non-food consumer products (for example cosmetic products and their ingredients . . .)." Essentially, the E.U. relies on the SCCS's testing and scientific findings to craft regulations in similar fashion to how the U.S. federal government relies on the FDA's research to craft regulations.

149.     On May 10, 2019, the SCCS issued a final "Opinion on the safety of Butylphenyl methylpropional (p-BMHCA) in cosmetic products – Submission II," which set forth the SCCS's findings on the safety of using lilial, a chemical used as a fragrance in cosmetic and other products.[25] Specifically, the SCCS opinion answered two questions: (1) "[d]oes the SCCS consider Butylphenyl methylpropional (p-BMHCA) safe for use as a fragrance ingredient in cosmetic leave-on and rinse-off type products . . . ?;" and (2) "[d]oes the SCCS have any further scientific concerns with regard to the use of Butylphenyl methylpropional (p-BMHCA) as a fragrance ingredient in cosmetic leave-on and/or rinse-off type products?"

150.     To determine the answers to these questions, the SCCS studied the results of animal testing, assessed lilial's chemical makeup, and conducted a toxicological evaluation on lilial. Part of the animal testing was conducted on both male and female rats by repeatedly giving lilial to them in

---

[25] Scientific Committee on Consumer Safety, "OPINION ON the safety of Butylphenyl methylpropional (p-BMHCA) in cosmetic products – Submission II," adopted on May 10, 2019, https://health.ec.europa.eu/system/files/2021-08/sccs_o_213_0.pdf.

measured amounts. SCCS scientists determined that **both male and female rats had experienced damaging effects to reproductive organs that negatively affected reproductive performance**, suggesting that lilial use brought with it the risk of infertility. The SCCS also utilized clinical study findings to assess lilial's chemical makeup and to conduct a toxicological evaluation on lilial.

151.    From these scientific studies, SCCS determined that lilial presented a risk of "**reproductive toxicity**" to humans. Therefore, the opinion reasoned that "aggregate exposure" to lilial "**cannot be considered as safe**."

152.    The SCCS opinion further noted that lilial is an allergen to humans that can trigger skin irritation when in contact with skin, writing, "[M]ainly based on clinical studies, **the SCCS considers [lilial] as an 'established contact allergen in humans'**", an opinion it has held since 2012 (SCCS, 2012)."

153.    Allergic reactions occurring on the scalp can trigger inflammation and irritation, and if prolonged, can hurt hair follicles, precipitate hair loss, and even trigger contact dermatitis.

154.    In August 2020, after digesting the SCCS opinion on lilial, the E.U. acted pursuant to the CLP to amend the CLP to ban lilial from being included in consumer cosmetic products. In particular, the E.U. stated that lilial was a "**reprotoxic**" substance, i.e., that lilial could negatively affect fertility and fetal development. The ban was set to take effect on March 1, 2022.

155.    The U.K. quickly followed suit, requiring all U.K. businesses selling products with lilial to cease selling them by October 15, 2022 and to remove all products containing lilial from store shelves by December 15, 2022. Therefore, Olaplex would be prohibited from selling its originally-formulated No. 3 Hair Perfector, which contained lilial, in the E.U. and U.K. after March 1, 2022 and December 15, 2022, respectively.

**The Product Safety Misconduct**

156.    Olaplex insiders concealed from investors that they knew, since prior to the Relevant Period: (1) that Olaplex's No. 3 Hair Perfector had contained lilial, a known reprotoxic substance; (2) that the Company had reformulated No. 3 Hair Perfector to remove lilial in June 2021; and (3) that, despite known health risks associated with lilial, Olaplex had chosen to continue selling inventory of the

pre-reformulation No. 3 product that contained lilial for months after June 2021, ***thereby risking the reproductive health of its consumers***. Although Olaplex touted its commitment to consumer health through the manufacture and sale of "clean" haircare products, Olaplex insiders knew that the Company's main product contained a reprotoxic substance that could potentially harm the human reproductive system and, thus, posed a significant risk to Olaplex's social media-reliant brand reputation and overall commercial viability.

157.    As of April 15, 2021, Olaplex's website stated that lilial was among No. 3 Hair Perfector's ingredients. Additionally, Olaplex's Safety Data Sheets, also on the Company's website as of at least April 20, 2021, indicated that No. 3 Hair Perfector contained lilial, per "Section 3 – Composition/Information on Ingredients." However, as of August 13, 2021, just six weeks before the Offering, the Company changed No. 3 Hair Perfector's ingredient list by removing lilial. Moreover, the ingredient list contained in the Safety Data Sheet that currently resides on Olaplex's website, which represents that it was updated on June 27, 2021, does not list lilial as an ingredient for No. 3 Hair Perfector. However, Defendants kept this truth hidden from investors, instead concealing the risks associated with lilial and the Company's reformulation of its No. 3 Hair Protector in June 2021 to address the same.

158.    While concealing the risks associated with lilial and the Company's reformulation of its No. 3 Hair Protector in June 2021, Olaplex caused further harm to shareholders by selling its old inventory of No. 3 which still contained lilial to the investing public. Notably, Olaplex continued this practice even though the Company had removed lilial from the Safety Data Sheet ingredient list as early as June 27, 2021. Olaplex later admitted, in March 2022, that the Company continued to sell old inventory of No. 3 Hair Perfector, with lilial, until at least January 2022. In other words, ***for at least six months***, the Company knew of the health risks associated with lilial yet failed to inform investors of these risks, instead choosing to sneakily sell its lilial-tainted products to the unknowing consuming public, thereby risking their reproductive health.

***Former Company Employees Confirm That Olaplex Knew About the Issues with Lilial and About the Decreasing Market Demand for the Company's Products, Yet Concealed These Realities from Investors***

159.    The Securities Class Action interviewed numerous former employees of Olaplex, all of whom corroborated these circumstances, including that the Company was paying close attention to the E.U.'s efforts to ban lilial due to its potential reprotoxic attributes. Some of the former employees worked for Olaplex years prior to the Offering and continued to work for Olaplex after the Offering.

160.    For example, CW-1, who served as Olaplex's Chief Digital Officer from June 2017 until mid-2020, and who directly reported to Company leaders, stated that Olaplex was first made aware of the lilial issue in the second quarter of 2019 when litigation surrounding lilial arose in Germany. CW-1 stated that Olaplex took this development as a warning sign that the E.U. would potentially move to investigate, regulate, and outright ban lilial in the future. Moreover, CW-1 represented that Olaplex's leadership would have been knowledgeable of regulation problems in Europe, and further stated that the Company used Obelis Group—a compliance, oversight, and consulting firm based in the Netherlands—to aid Olaplex with these kinds of problems. CW-1 also represented that Sephora initially brought the lilial issue to Olaplex's attention, as the Company generally followed its largest retailers' leads on product formulations.

161.    CW-1 stated that the lilial situation would influence Olaplex's sales and marketing efforts. CW-1 further noted that the cosmetics industry is highly competitive, and that competing companies will often attempt to knock off the top company in any way they can. Specifically, CW-1 stated that if any possible problems with ingredients surface, especially problems that cause the public to say "look!", it can have a serious sales impact on companies' product sales. CW-1 further admitted that ***Olaplex's active ingredient did not actually work to repair hair, but only modestly altered how hair felt***, adding that haircare products are largely marketed in a fashion to make people think the products will help them.

162.    Another former employee, CW-2, who oversaw the Company's product development, procurement, and sourcing from November 2018 until early 2023, and who initially reported directly to Defendant Wong, stated that they were acquainted with lilial's problems. In particular, CW-2 stated that approximately six months before the Offering, in March 2021, a Senior Manager of Regulatory Affairs notified CW-2 through a group email that lilial needed to be removed from Olaplex's products. CW-2

indicated that Olaplex categorized the ingredient change as a "soft change," which meant that Olaplex planned to continue to sell its old products containing lilial even though the Company reformulated a new version without the harmful ingredient. According to CW-2, Olaplex considered this method satisfactory since lilial was not banned in the U.S. and the U.S. is the Company's largest market.

163.    CW-2 also stated that Olaplex could reformulate its products with lilial for a minimum cost since lilial was only used as a fragrance additive. The only real cost to Olaplex, according to CW-2, resulted from needing to reformat the ingredient labels on product containers themselves.

164.    When the lilial problem began to emerge on social media in early 2022, CW-2 described Olaplex's reaction as a "fire drill." CW-2 also remembered that Olaplex had begun seeing less demand and less sales in the second quarter of 2022 than in the second quarter of 2021. CW-2 revealed that Olaplex had a team that managed product sales performance, named Planning and Inventory, which was in addition to the Company's Financial Planning & Analysis team. Moreover, CW-2 indicated that that Defendant Wong, Defendant Walden, and Juliane Park, the Company's Chief Transformation Officer, were aware of the effect the lilial problem had on the Company's product sales, as the three of them monitored product sales performance data.

165.    Regarding product demand, CW-2 stated that between 2018 and the end of 2021, Olaplex had to increase production to satisfy demand and that the Company never needed to make less product on a month-to-month basis. However, CW-2 noted that this trend changed in 2022, as Olaplex by that point had too much inventory on hand, largely due to increased competition.

166.    CW-2 attributed Olaplex's poor sales and excess inventory to two things: (i) the Company's failure to accurately forecast product demand; and (2) the Company's failure to answer negative reports and social media posts about the Company's products. CW-2 concluded that, today, "everyone" has a hair bond builder product like Olaplex, so the Company is losing its market superiority.

167.    Another former employee, CW-3, who worked as a marketing manager from April 2022 through Fall 2022, corroborated CW-2's statements that the lilial problem had caused Olaplex's products sales to lag in 2022. CW-3 worked with Director of Sales, Sammy Sawa, who reported directly

to Defendant Walden. CW-3 noted that when they began work at the Company in April 2022, Olaplex's sales were negatively affected by media reports and social media posts that discussed the presence of lilial in the Company's haircare products. CW-3 represented that the lilial issue began near the end of February 2022 or the beginning of March 2022, and that the lilial issue unfolding in public was largely to blame for Olaplex's lagging product sales. According to CW-3, the situation was so poor that Sales team employees asked the Marketing team to help boost product sales.

168.     Indeed, CW-3 stated that the Sales team incessantly grumbled to the Marketing team that the Marketing team was not doing enough to produce sales. CW-3 thought that producing sales was the Sales team's role, not Marketing's, and that the Sales team did not accurately understand the Marketing team's role. CW-3's "takeaway" from the Sales team's complaints was that the Sales team was under significant stress to raise Olaplex's product sales figures. CW-3's position on this matter was further corroborated by an email sent in late September 2022 from another employee who worked for the Sales team. The email, addressed to the Sales team and from Defendant Walden, was "very aggressive," "shocking," and potentially inappropriate. In the email, Defendant Walden sought to spur the Sales team to raise its figures because she had to present the sales figures to the Board at an upcoming meeting. CW-3 described Defendant Walden's leaving Olaplex as sudden.

169.     Additionally, CW-3 heard chatter among the Sales team that K18, a competitor of Olaplex, was threatening the Company's market share. CW-3 explained that K18 was a significant threat because K18's product was very similar to Olaplex's hair bond products. CW-3 also named Living Proof as another potential competitor, again because Living Proof has similar products to Olaplex. CW-3 further stated that Olaplex had started experiencing losses in sales from K18 in the beginning of 2022, while competition with Living Proof was going on for some time before the start of 2022.

170.     CW-3 further represented that former colleagues who still work for Olaplex on the Marketing team have told CW-3 that the Company is suffering from excess inventory at retail stores. Specifically, CW-3 had been told, in October 2022 or November 2022, that Olaplex had inventory "stuck" with retail stores and that the amount of excess inventory led to purchase orders having to be

reduced. CW-3 had also heard from other employees in Marketing and Operations that Olaplex may have had to reduce product manufacturing due to inventory excess.

171.     Olaplex's extra inventory issue was compounded by Olaplex's decision, before the Offering, to retain more inventory than the Company retained in the past. Indeed, Defendant Tiziani would admit almost a year after the Offering, on August 9, 2022, that Olaplex made a "strategic decision" "in the middle of last year" (i.e., midway through 2021) to "hold more months on hand of inventory." Therefore, just before the Offering, Olaplex knowingly retained more inventory, which could damage the Company's bottom line if demand slowed. Coupled with the fact that Olaplex was attempting to handle the impending E.U. lilial ban and that Olaplex's business was highly reliant on positive social media discourse, Olaplex faced substantial risks to its business, operations, and prospects which were not disclosed in the Registration Statement and throughout the Relevant Period.

172.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Olaplex engaged in the Product Safety Misconduct; (2) as a result of, and as part of, the Product Safety Misconduct, Olaplex faced large risks to its reputation and overall stature in a remarkably competitive industry which was highly reliant on positive social media reviews; and (3) Olaplex failed to maintain internal controls. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

***The Registration Statement***

173.     The Registration Statement, filed with the SEC on August 27, 2021 and declared effective on September 29, 2021, represented to investors that Olaplex was not currently facing any regulatory issues that could result in the Company having to reformulate a product or potentially negatively affect the Company's brand reputation. Instead, the Registration Statement played down the

fact that Olaplex was facing an ultimatum: either remove lilial from its premier product by a looming deadline or risk being prohibited from selling products containing lilial in the E.U. and the U.K., which constituted Olaplex's second largest market. Additionally, the Registration Statement did not disclose the great risks that Olaplex faced from the prospect of bad publicity emanating from social media which could significantly injure the Company's brand reputation, and in result, negatively affect Olaplex's ability to sell its products. All the above thus rendered the Registration Statement materially inaccurate.

174.    The Prospectus, filed with the SEC on October 1, 2021, contained the same misrepresentations and forms part of the Registration Statement. Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi signed the Registration Statement.

175.    The Registration Statement provided that Olaplex "could" or "may" have to respond to changes in domestic or international laws and regulations that "could" or "may" require Olaplex to reformulate products or remove certain ingredients. If these problems were to occur, the Registration Statement stated, the problems "could" or "may" affect Olaplex's "brand reputation and image in the marketplace." Specifically, the Registration Statement stated the following:

> Our products are subject to federal, state and international laws, regulations and policies that could have an adverse effect on our business, prospects, results of operations, financial condition and/or cash flows.
>
> ***Our business is subject to numerous laws, regulations and policies around the world.*** Many of these laws and regulations have a high level of subjectivity, are subject to interpretation, and vary significantly from market to market. ***These laws and regulations can have several impacts on our business, including:***
>
> • delays in ***or prohibitions of selling a product or ingredient in one or more markets;***
>
> • limitations on our ability to import products into a market;
>
> • delays and expenses associated with compliance, such as record keeping, documentation of the properties of certain products, labeling, and scientific substantiation;
>
> • limitations on the labeling and marketing claims we can make regarding our products; and

*• limitations on the substances that can be included in our product, resulting in product reformulations*, or the recall and discontinuation of certain products that cannot be reformulated to comply with new regulations.

*These events could interrupt the marketing and sale of our products, cause us to be subject to product liability claims, severely damage our brand reputation and image in the marketplace, increase the cost of our products, cause us to fail to meet customer expectations* or cause us to be unable to deliver products in sufficient quantities or sufficient quality, *which could result in lost sales.*

Before we can market and sell our products in certain jurisdictions, the applicable local governmental authority may require evidence of the safety of our products, which may include testing of individual ingredients at relevant levels. In particular, because Bis-amino is our proprietary ingredient, it typically is not a pre-approved ingredient for use in products in specific jurisdictions and we have been required in the past, and may be required in the future, to perform testing and provide other data and information to governmental authorities prior to the sale of our products in the jurisdiction. For example, Australian authorities have required us to perform additional testing on Bis-amino to register Bis-amino under Australia's Industrial Chemical Introduction Scheme (AICIS), to be able to sell certain of our products in Australia. We are performing the final testing required, and have received provisional approval to sell our products. Although we are confident in our ability to obtain final approval, the Australian authorities could withdraw the provisional approval, resulting in impacts on our sales of certain products in Australia. Furthermore, our international customers are primarily responsible for registering ingredients or otherwise obtaining any approvals necessary for them to sell our products in the applicable territory and any failure by them to do so could decrease sales of our products and harm our reputation. Delays in or prohibition of selling our products, *or the need to reformulate the ingredients used in our products, could have an adverse effect on our existing business and future growth.*

*Additional laws, regulations and policies, and changes, new interpretation or enforcement thereof, that affect our business could adversely affect our financial results.* These include accounting standards, laws and regulations relating to tax matters, trade, data privacy and data security, anti-corruption, advertising, marketing, manufacturing, distribution, customs matters, product registration, *ingredients, chemicals*, packaging, selective distribution, environmental or climate change matters. *Changes may require us to reformulate or discontinue certain of our products or revise our product packaging or labeling, any of which could result in, among other things, increased costs to us, delays in our product launches, product returns or recalls and lower net sales, and therefore could have an adverse effect on our business, prospects, results of operations, financial condition and/or cash flows.*

176.    The Registration Statement also provided that Olaplex's products "could" be determined to be "unsafe" which "could" have a negative effect on the Company's business:

*If our products are found to be defective or unsafe we may be subject to various product liability claims, which could harm our reputation and business.*

***Our success depends, in part, on the quality and safety of our products. If our products are found to be defective, unsafe, or otherwise fail to meet our consumers' expectations or if our product claims are found to be unfair or deceptive, our relationships with customers or consumers could suffer, the appeal of one or more of our products could be diminished and we could lose sales, any of which could result in an adverse effect on our business.*** For example, we have historically received complaints regarding our products, including complaints alleging that our products have caused dryness, skin irritation, hair loss, or hair damage, or have failed to improve the look and texture of hair. We conduct testing of our products and, based on these tests, do not believe that our products are the direct cause of such adverse effects. However, regardless of their merit, ***these or future complaints could have a negative impact on the reputation of our products and our brand***, cause us to recall or stop selling our products, or lead to increased scrutiny or enforcement action from regulatory authorities, ***any of which could adversely affect our business and financial results.***

177.   The Registration Statement provided that "if" Olaplex did not "meet customer expectations" or "customers were not convinced that our products are superior" to other haircare product companies, Olaplex's business "could" suffer, stating:

***If we fail to attract new customers and consumers, retain existing customers and consumers, or fail to maintain or increase sales to those customers and consumers, our business, prospects, results of operations, financial condition, cash flows and growth prospects will be harmed.***

Our success depends in large part upon widespread adoption of our products by consumers. In order to attract new consumers and continue to expand our customer and consumer base, we must appeal to and attract hairstylists and consumers who identify with our products. ***If we fail to deliver a high-quality consumer experience or if our current or potential future customers are not convinced that our products are superior to alternatives, then our ability to retain existing customers, acquire new customers and grow our business may be harmed.*** We have made significant investments in enhancing our brand, attracting new customers and interacting with our hairstylist and consumer communities, and we expect to continue to make significant investments to promote our products. Such campaigns can be expensive and may not result in new customers or consumers or increased sales of our products. Further, as our brand becomes more widely known, we may not attract new consumers or increase our net sales at the same rates as we have in the past. ***If we are unable to acquire new customers who purchase products in numbers sufficient to grow our business, we may not be able to generate the scale necessary to drive beneficial network effects with our suppliers, our net revenues may decrease, and our business, financial condition and operating results may be materially adversely affected.***

In addition, our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net sales are generated from sales to existing customers, particularly those existing customers who are highly engaged

and make frequent and/or large purchases of the products we offer. We may be affected by changes in the policies and demands of our professional and specialty retail customers relating to inventory management, changes in pricing, marketing, advertising and/or promotional strategies by such customers, space reconfigurations by our customers or any significant decrease in our display space or online prominence or the ongoing COVID-19 pandemic as retailers faced store closures or reduced traffic. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, including shipping times, or if we are unable to timely update our products to meet current trends and customer demands, ***our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.***

***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations and growth prospects will be harmed.***

178.   The Registration Statement further provided that Olaplex "may" not be able to retain its positive brand reputation if the Company endured negative publicity and also maintained that Olaplex's significant reliance on social media "could" or "may" negatively impact consumer choices and lower demand for Olaplex products. For instance, the Registration Statement boasted that Olaplex enjoys a "competitive advantage" in the cosmetics industry since the Company has a robust network of professional hair stylists and consumers that make up a "strong and loyal following":

Science-Backed Brand that Attracts a Loyal and Engaged Community

We offer science-backed solutions that improve hair health and are trusted by stylists and consumers. We identify our consumers' most relevant haircare concerns in collaboration with our passionate and highly engaged community of professional hairstylists and consumers, and strive to address them through our proprietary technology and innovation capabilities. Our deep roots in the professional haircare community and strong ties with our global network of hairstylists creates a continuous feedback loop, providing unique insight into the hair health goals and concerns of our consumers. Our hairstylists are our strongest advocates; they have grown with our business since our founding in 2014, and through mutual support we have empowered them to connect with their clients and to champion our brand through an engaged and active social community. This community also provides insight into consumer needs and positions OLAPLEX to leverage our research and development platform to respond to consumers' demands for improved hair health by creating high-quality products that result in healthy, beautiful hair. Results have validated our approach. We believe that over 90% of our consumers think OLAPLEX products make their hair healthier, which we believe is among the highest ratings compared to competitors in this category. Moreover, we believe OLAPLEX's professional net promoter score of 71% as of April 2021 is the highest in our brand category and well above the average score in our category. ***The quality of our products, combined with our community-driven approach to engaging with both professional***

*hairstylists and our consumers, have created a strong and loyal following for OLAPLEX that we believe provides a unique competitive advantage and foundation for growth.*

179.   The Registration Statement also provided that risks involving "negative publicity" and "the use of social media and internet based-communication" in advertising Olaplex's products "could" have a negative effect on Olaplex's "brand image and [] reputation":

> *Our business depends on our ability to maintain a strong community of engaged customers, consumers and ambassadors, including by social media. We may not be able to maintain and enhance our brand if we experience negative publicity* related to our marketing efforts or use of social media, fail to maintain and grow our network of ambassadors *or otherwise fail to meet our customers' or consumers' expectations.*

> We currently partner with eight brand ambassadors who promote and market our products, participate in product launches, engage with our professional hairstylist and consumer community and educate them about Olaplex products. Our ability to maintain relationships with our existing ambassadors and to identify new ambassadors is critical to expanding and maintaining our customer and consumer base. As our market becomes increasingly competitive or as we expand internationally, recruiting and maintaining new ambassadors may become increasingly difficult. If we are not able to develop and maintain strong relationships with our ambassador network, our ability to promote and maintain awareness of our brand may be adversely affected. Further, if we incur excessive expenses in this effort, our business, financial condition and results of operations may be adversely affected.

> *We and our ambassadors often use third-party social media platforms to raise awareness of our brand and engage with our hairstylist and consumer community. In recent years, there has been a marked increase in the use of social media platforms, including blogs, chat platforms, social media websites, and other forms of internet-based communications that allow individuals to interact with our products, which acts as a means to enhance brand awareness. As existing social media platforms evolve and new platforms develop, we and our ambassadors must continue to maintain a presence on these platforms and establish presences on emerging popular social media platforms.* If we are unable to cost-effectively develop and continuously improve our consumer-facing technologies, such as social media platforms, our ability to acquire new customers and consumers may suffer and we may not be able to provide a convenient and consistent experience to our consumers regardless of the sales channel. *This could negatively affect our ability to compete with other companies and result in diminished loyalty to our brand.*

> *The use of social media by our brand ambassadors, our consumers and us has increased the risk that our image and reputation could be negatively impacted.* In particular, the reputation of our brand ambassadors could impact how consumers view our products or brand. *The rising popularity of social media and other consumer-oriented technologies has increased the speed and accessibility of information*

*dissemination and given users the ability to organize collective actions such as boycotts and other brand-damaging behaviors more effectively. The dissemination of information via social media could harm our brand or our business, regardless of the information's accuracy. This could include negative publicity related to our products or negative publicity related to actions taken (or not taken) by us or our executives*, team members, employees, brand ambassadors, contractors, collaborators, vendors, consultants, advisors or other individuals or entities that may be perceived as being associated with us. Such negative publicity may relate to actions taken (or not taken) with respect to social, environmental, and community outreach issues and initiatives. The harm may be immediate, without affording us an opportunity for redress or correction and could have an adverse effect on our business, financial condition and results of operations. In addition, an increase in the use of social media for product promotion and marketing may increase the burden on us to monitor compliance of such materials, and increase the risk that such materials could contain problematic product or marketing claims in violation of applicable regulations. For example, in some cases, the U.S. Federal Trade Commission ("FTC") has sought enforcement action where an endorsement has failed to clearly and conspicuously disclose a financial relationship or material connection between an influencer and an advertiser.

We also do not prescribe what our ambassadors post, and our ambassadors could engage in behavior or use their platforms in a manner that reflects poorly on our brand or is in violation of applicable regulations or platform terms of service, and all these actions may be attributed to us. *In addition, customer complaints or negative publicity related to our website*, mobile app, products, product delivery times, customer data handling, marketing efforts, security practices or customer support, *especially on blogs and social media websites, could diminish customer loyalty and community engagement. Our inability or failure to recognize, respond to, and effectively manage the accelerated impact of social media could adversely impact our business.* Further, laws and regulations, including associated enforcement priorities, rapidly evolve to govern social media platforms and other internet-based communications, and any failure by us, our ambassadors or other third parties acting at our direction or on our behalf to abide by applicable laws and regulations in the use of these platforms could subject us to regulatory investigations, class action lawsuits, liability, fines or other penalties. *Other risks associated with the use of social media and internet based- communication* include improper disclosure of proprietary information, *negative comments about our brand or products*, exposure of personally identifiable information, fraud, hoaxes, or malicious dissemination of false information. *Damage to the brand image and our reputation could have an adverse effect on our business, results of operations and financial condition.*

180.    The Registration Statement also stated that "consumer preferences" may be impacted by "sudden challenges" that Olaplex "may face in the marketplace" which "could" affect the Company's overall business:

Our inability to anticipate and respond to market trends and *changes in consumer preferences could adversely affect our financial results.*

*Our continued success depends on our ability to anticipate, gauge and react in a timely and cost-effective manner to changes in consumer tastes for haircare* and other beauty products, attitudes toward our industry and brand, as well as to where and how consumers shop. *We must continually work to maintain and enhance the recognition of our brand*, develop, manufacture and market new products, maintain and adapt to existing and emerging distribution channels, successfully manage our inventories and modernize and refine our approach as to how and where we market and sell our products. *Consumer tastes and preferences cannot be predicted with certainty and can change rapidly. The issue is compounded by the increasing use of digital and social media by consumers and the speed by which information and opinions are shared. If we are unable to anticipate and respond to sudden challenges that we may face in the marketplace, trends in the market for our products and changing consumer demands and sentiment, our business, financial condition and results of operations will suffer*. In addition, from time to time, sales growth or profitability may be concentrated in a relatively small number of our products or countries. *If such a situation persists or a number of products or countries fail to perform as expected, there could be an adverse effect on our business, financial condition and results of operations.*

181.    The Registration Statement also boasted about Olaplex's strong brand reputation and "favorable brand recognition" as enablers that gave the Company an edge over competitors and allowed Olaplex to "compete effectively":

Competition in the haircare industry is based on a variety of factors, including innovation, effectiveness of beneficial attributes, accessible pricing, service to the consumer, promotional activities, advertising, special events, new product introductions, e-commerce initiatives and other activities. Our competitors include Henkel AG & Co. KgaA, Kao Corporation, L'Oreal S.A. and Unilever. We also face competition from a number of independent brands. Certain of our competitors also have ownership interests in retailers that are customers of ours.

*The continued strength of our brand and products is based on our ability to compete with other companies in our industry. We compete primarily by:*

• developing quality products with innovative performance features;

• educating consumers, retail customers and salon professionals about the benefits of our products;

• anticipating and responding to changing consumer, retail customer and salon professional demands in a timely manner, including the timing of new product introductions and line extensions;

• offering products at compelling and accessible price points across channels and geographies;

• *maintaining favorable brand recognition;*

• developing and sustaining our relationships with our key customers;

• ensuring product availability through effective planning and replenishment collaboration with our customers;

• *leveraging e-commerce, social media and the influence of our brand ambassadors and developing an effective omni-channel strategy to optimize the opportunity for consumers to interact with and purchase our products both on-line and in brick and mortar outlets;*

• attracting and retaining key personnel;

• maintaining and protecting our intellectual property;

• maintaining an effective manufacturing and distributor network; and

• obtaining and retaining sufficient retail display and floor space, optimal in-store positioning and effective presentation of our products on retailer's shelves.

*We believe we have a well-recognized and strong reputation in our core markets and that the quality and performance of our products*, our emphasis on innovation, and engagement with our professional and consumer community *position us to compete effectively.*

182.   The Registration Statement further stated that Olaplex's "strong reputation" and social

media presence "position[ed] [Olaplex] to compete effectively":

*We operate in highly competitive categories.*

*We face competition from companies throughout the world, including multinational consumer product companies. Most of our competitors have greater resources than we do, some others are newer companies and some are competing in distribution channels or territories where we are less represented.* Our competitors also may be able to respond to changing business and economic conditions more quickly than us due to larger research and development operations, manufacturing capabilities and sales force. Competition in the beauty industry is based on a variety of factors, including innovation, effectiveness of beneficial attributes, accessible pricing, service to the consumer, promotional activities, advertising, special events, new product introductions, e-commerce initiatives and other activities. It is difficult for us to predict the timing and scale of our competitors' actions in these areas.

*Our ability to compete also depends on the continued strength of our brand and products*, our ability to attract and retain key talent and other personnel, the influence of our brand ambassadors, the efficiency of our third-party manufacturing facilities and distribution network, our relationships with our key customers and our ability to maintain and protect our intellectual property and those other rights used in our business. *We*

*believe we have a well-recognized and strong reputation in our core markets and that the quality and performance of our products*, our emphasis on innovation, *and engagement with our professional and consumer community position us to compete effectively. However, if our reputation is adversely affected, our ability to attract and retain customers and consumers would be impacted*. In addition, certain of our distributors in the United States and key retailers are owned or otherwise affiliated with companies that market and sell competing brands and, as a result, they may have an interest in promoting theses competing brands over our products. *Our inability to continue to compete effectively in key countries around the world could have an adverse effect on our business, financial condition and results of operations.*

183.    The Registration Statement also characterized Olaplex's ability to address "challenges" such as a "slowdown" in product demand or "increased competition" to the Company's future growth as far off, future uncertainties:

Our recent rapid growth may not be sustainable or indicative of future growth, and we expect our growth rate to ultimately slow over time.

We have experienced significant and rapid growth. Net sales increased from $148.2 million in 2019 to $282.3 million in 2020. For the six months ended June 30, 2020 and 2021, we had net sales of $99.6 million and $270.2 million, respectively. Our historical rate of growth may not be sustainable or indicative of our future rate of growth, and in future periods, our net sales could grow more slowly than we expect or decline. *We believe that continued growth in net sales, as well as our ability to improve or maintain margins and profitability, will depend upon, among other factors, our ability to address the challenges, risks and difficulties described elsewhere in this "Risk Factors" section. We cannot provide assurance that we will be able to successfully manage any such challenges or risks to our future growth. Any of these factors could cause our net sales growth to slow or decline and may adversely affect our margins and profitability. Even if our net sales continue to increase, we expect that our growth rate may slow for a number of other reasons, including if there is a slowdown in the growth of demand for our products, increased competition*, a decrease in the growth or reduction in the size of our overall market or if we cannot capitalize on growth opportunities. Failure to continue to grow our net sales or improve or maintain margins would adversely affect our business, financial condition and results is operations. You should not rely on our historical rate of growth as an indication of our future performance.

184.    Lastly, the Registration Statement attributed the possibility of the Company's "quarterly results of operations" to "fluctuate" to "the impact of competitive developments" and noted that these fluctuations "may" or "could" have an adverse impact on Olaplex's overall business:

*Our quarterly results of operations may fluctuate, and if our operating and financial performance in any given period does not meet the guidance that we have provided to*

***the public or the expectations of our investors and securities analysts, the trading price of our common stock may decline.***

***Our quarterly results of operations may fluctuate for a variety of reasons***, many of which are beyond our control. ***These reasons include those described in these risk factors as well as the following***:

• fluctuations in product mix;

• our ability to effectively launch and manage new products;

• fluctuations in the levels or quality of inventory;

• fluctuations in capacity as we expand our operations;

• ***our success in engaging existing customers and consumers and attracting new customers and consumers***;

 • the amount and timing of our operating expenses;

• the timing and success of new product launches and expansion into new geographic markets;

• ***the impact of competitive developments and our response to those developments***;

• the impact of the COVID-19 pandemic;

• our ability to manage our existing business and future growth; and

• economic and market conditions, particularly those affecting our industry.

***Fluctuations in our quarterly results of operations may cause those results to fall below the guidance that we have provided to the public or the expectations of our investors and securities analysts, which could cause the trading price of our common stock to decline***. Fluctuations in our results could also cause a number of other problems. For example, analysts or investors might change their models for valuing our common stock, we could experience short-term liquidity issues, our ability to retain or attract key personnel may diminish and other unanticipated issues may arise.

In addition, we believe that our quarterly results of operations may vary in the future and that period-to-period comparisons of our results of operations may not be meaningful. You should not rely on the results of one quarter as an indication of future performance.

185.     The Registration Statement also stated that Olaplex's products were "***clean***," denoting that the Company's products were free of any "harmful ingredients," such as parabens, sodium lauryl sulfate and sodium laureth sulfate, phthalates, mineral oils, formaldehyde, and other toxic ingredients or

allergens that are associated with numerous health and safety concerns. For instance, the Registration Statement boasted that the Company focuses on "*produc[ing] clean products*" without "*harmful ingredients*," among other things:

Commitment to Social and Environmental Consciousness

\*\*\*

*Environmental Sustainability*. We continue to explore ways to reduce our carbon footprint and to contribute to a more sustainable future for our planet. One of our key initiatives is to limit the use of secondary packaging in which our products are sold. We believe that between 2015 to 2021 we avoided the use of approximately 2.9 million pounds of paper packaging, which we believe prevented approximately 23 million pounds of greenhouse gas from being emitted into the environment, conserved approximately 37 million gallons of water and saved approximately 29,000 trees from deforestation, as compared to manufacturing, packaging and distribution alternatives. In addition, *we strive to produce clean products that exclude certain harmful ingredients*. These efforts are well recognized in the industry, with OLAPLEX being one of only 21 haircare brands accredited with the "Clean at Sephora" designation, as of July 31, 2021.

186.   Further, the Registration Statement declared that Olaplex could meet the "high demand for clean" products by consumers who are concerned about "health and wellness":

Consumers are Increasingly Focused on Health and Wellness

\*\*\*

Several significant tailwinds support the long-term growth prospects of the haircare market. The way our consumers feel about their hair has a strong impact on how they perceive themselves; we believe that continued focus on personal appearance and wellness will drive increased spend in the category. We believe consumers are also becoming increasingly health-conscious, *generating a high demand for clean*, technology-backed beauty products that achieve results, and that the importance of hair health has driven increased willingness among our consumers to invest in premium-quality products. *Our offerings*, which are able to deliver results after the first use, *position us well to meet this rising consumer demand*.

187.   The Registration Statement also boasted that Olaplex focuses on designing "clean" products which "has driven strong organic growth":

Synergistic Channel Strategy Underpinned by Our Omni-Channel Approach
\*\*\*
*Since our first product launch, we have focused on developing clean*, technology-based *beauty products* and created powerful engagement between professional hairstylists and our consumers, *which has driven strong organic growth*.

188.     The statements in ¶¶ 173-187 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Defendants were engaging in and/or causing the Company to engage in the Product Safety Misconduct; (2) Olaplex's Offering was solicited on false and misleading information; (3) Olaplex was not facing the possibility of laws and regulations changing in the future, but was already facing material events that could negatively affect Olaplex's business, operations, prospects, and overall brand reputation; (4) the Company was aware that the E.U. moved to ban lilial in August 2020 after classifying the chemical as a reprotoxic chemical with links to infertility; (5) in response to the E.U.'s impending lilial ban, Olaplex had already reformulated its No. 3 Hair Perfector product in June 2021 to remove lilial internationally, just mere months before the Offering; (6) despite reformulating No. 3 Hair Perfector to remove lilial, Olaplex chose to retain the old product inventory containing lilial on hand and continued to sell the old inventory for months, at least until January 2022; (7) as a result, the excess inventory put Olaplex, its retailers, and its distributors in a high risk position were the Company to experience a downturn in product sales; (8) Olaplex represented that the Company was highly concerned about their customers' health and well-being and strove to design "clean" products while selling products that contained a reprotoxic chemical with links to infertility; (9) as a result, Olaplex faced serious risks that the Company's brand reputation, especially by and through social media, would be significantly damaged by the E.U.'s lilial ban; and (10) Olaplex failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *November 10, 2021 Press Release*

189.     On November 10, 2021, the Company issued its first press release after the Offering, which reported Olaplex's third quarter of 2021 financial performance. The press release reported that Olaplex enjoyed an 81% increase in net sales, which Olaplex stated "reflect[s] strong growth across all channels of distribution driven by increased velocity of existing products, the launch of new products, and the addition of new customers, both in the U.S. and Internationally."

### *November 10, 2021 Earnings Conference Call*

190.    That same day, on November 10, 2021, Olaplex held an earnings conference call with investors and analysts to discuss the Company's third quarter of 2021 performance. During the call, an analyst asked a question pertaining to Olaplex's product distribution to professional salons and specialty retailers, including Ulta Beauty. Defendant Wong responded by stating that "brand building" was one of the Company's "key growth considerations," among other things:

> As to what else are we going to go, in terms of expansion of distribution in Specialty Retail. As I've mentioned, we just have so much with our core accounts that we really want to be the #1 hair care brand of the top 5 beauty brands in their offering so that we become an anchor brand for them. ***And when we are anchored brands for any of our partners, we then are able to really partner up on marketing, brand building as well as growth. So those are key growth considerations for us, in our partnership with our existing players.***

191.    Later in the call, another analyst asked a question about Olaplex's activities for cultivating brand reputation and a larger consumer base. Defendant Wong responded by emphasizing the Company's social media presence and its relationship with the Company's growth:

> I think, what is important to note is, we are very focused on what really builds long-term growth, and [what] studies have shown us that the three sources of truth, when it comes to brand building and marketing awareness, first and foremost, is the -- is -- especially for hair, is where they want to take recommendations from their professional hair stylist. ***So building that community will continue to be our focus. So with that said, the #2 area, the #2 source of truth, is product reviews and word of mouth, which is the third one, which means that we are already in that space through our social media engagement connection and conversion, with our performance marketing, whether it's via digital media or search engine optimization.*** We will continue all of this interactive tools to connect, engage and convert our customers. And if we continue to do that, the marketing, branding and the awareness build would just be a lot more organic as well as strategic because this is in partnerships, not only with what we are doing, but driving traffic to both online and offline retailers that we partner with.

192.    The statements in ¶¶ 189-191 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Defendants were engaging in and/or causing the Company to engage in the Product Safety Misconduct; (2) Olaplex's Offering was solicited on false and misleading information; (3) Olaplex was not facing the possibility of laws and regulations changing in the future, but was already facing material events that could negatively affect

Olaplex's business, operations, prospects, and overall brand reputation; (4) the Company was aware that the E.U. moved to ban lilial in August 2020 after classifying the chemical as a reprotoxic chemical with links to infertility; (5) in response to the E.U.'s impending lilial ban, Olaplex had already reformulated its No. 3 Hair Perfector product in June 2021 to remove lilial internationally, just mere months before the Offering; (6) despite reformulating No. 3 Hair Perfector to remove lilial, Olaplex chose to retain the old product inventory containing lilial on hand and continued to sell the old inventory for months, at least until January 2022; (7) as a result, the excess inventory put Olaplex, its retailers, and its distributors in a high risk position were the Company to experience a downturn in product sales; (8) Olaplex represented that the Company was highly concerned about their customers' health and well-being and strove to design "clean" products while selling products that contained a reprotoxic chemical with links to infertility; (9) as a result, Olaplex faced serious risks that the Company's brand reputation, especially by and through social media, would be significantly damaged by the E.U.'s lilial ban; and (10) Olaplex failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge While The False and Misleading Statements Continue

#### *February 27, 2022 Hasini Kay Tik Tok Videos*

193.    On February 27, 2022, beauty and cosmetic influencer Hasini Kay ("Kay") posted a five-second-long video on Tik Tok that contained the caption "When you find out Olaplex is going to be banned in the EU + UK next month."[26] Kay's short video revealed for the first time that Olaplex's products had used lilial, which was banned by the E.U. due to health concerns over lilial's effects on the human reproductive system. As of the date of filing of this Complaint, Kay's video has been viewed more than 1.1 million times, has more than 1,370 comments, and has been shared more than 3,500 times.

194.    That same day, Kay posted another video which explained that "[t]here are reports that Olaplex is being banned in the E.U. and the U.K., and that is because of this ingredient [referring to a

---

[26] No bc why is 2022 like this already? #olaplex #damagedhair #curlygirl ... | TikTok

google search of lilial], which has been linked to infertility."[27] Kay also revealed that "[s]ome sources say it has already been reformulated" to remove lilial. As of the date of filing of this Complaint, this video has been viewed more than 223,800 times, shared more than 2,000 times, and has received more than 9,019 likes and 380 comments. Both of Kay's videos spread across the internet quickly, with many Tik Tok users expressing disbelief at the news, as most were under the false impression that Olaplex was a "clean" company. For example, users commented, among other things, "*I use this weekly and have been trying to get pregnant for 4 years!*", "Okay but why are they putting dangerous chemicals in things we use everyday," "A company that thinks it's ok to put in a fertility killing ingredients should be permanently boycotted," and "*So I've been weeping over negative tests for years because of my hair!!!!!?*"

195.    The outcry was so swift and severe that Olaplex responded directly to Kay's videos via Olaplex's Tik Tok account, writing, "OLAPLEX No.3 Hair Perfector is not banned in the UK. Olaplex takes the health of our consumers and regulatory compliance seriously."

### February 28, 2022 Olaplex Social Media Video

196.    The following day, on February 28, 2022, Olaplex published a video on its social media accounts, which the Company represented was "in response to the recent social [media] posts" about lilial, "which Olaplex no longer uses in any of its products." Lavinia Popescu, Olaplex's Chief Scientist and Vice President ("VP") Research and Development ("R&D") and Regulatory, appeared in the video, stating that Olaplex had removed lilial from its No. 3 Hair Perfector product internationally. In the video, Popescu stated that she intended to "address this lilial subject that recently the *entire industry is talking about*." Popescu went on to say that "until last year, this ingredient [lilial] was classified as an allergen" and, although she maintained that the Company's products contained lilial *in small quantities* for this reason, Popescu conceded that "an allergen is a substance that could cause an allergic reaction and *we were very aware about this problematic, to say, function of the lilial*" ingredient.

197.    Popescu also stated that, "in the past, when we [found] out that eventually this ingredient can have other side effects [i.e., impacts on fertility and reproduction], we decided to take it out." She

---

[27] Reply to @rat_bastard why current olaplex formulas are being banned #... | TikTok

then repeated that "I want to be clear and I want to explain that we decided to take lilial out from our products, not only in the E.U. where in this moment [it] is banished, we decided to take it out globally." Popescu later stated that "in this moment, Olaplex is lilial-free."

198.    Popescu's statements on behalf of Olaplex admitted, for the first time, the possible "problematic" side-effects of lilial, including infertility and allergic reactions, and further revealed that they existed prior to the Offering, despite the Individual Defendants' failure to disclose these facts in the Registration Statement as described above. Popescu's admissions also revealed the importance of lilial concerns to consumers and investors, given Popescu's acknowledgment that the "entire industry" was "talking about" this problem and given the lengths Olaplex was going to salvage its brand reputation by informing the consuming and investing public that the Company no longer used lilial in its products.

### *March 1, 2022 The Independent Article*

199.    In the following days, news publications and social media posts extensively reported on Olaplex's lilial problem. For instance, on March 1, 2022, *The Independent* published an article titled, "Olaplex removes lilial from No.3 Hair Perfector following EU ban," which explained that the E.U. ban on lilial was the product of fertility concerns. The article also addressed the uproar on social media about Olaplex's use of lilial in its No. 3 Hair Perfector product. For example, the article stated that the TikTok video by Kay regarding Olaplex and the E.U. ban had "received almost one million views."

200.    The article also contained a quote from Olaplex which stated the following: "In a statement to the *Independent*, Olaplex said it had now removed the ingredient from its No.3 Hair Perfector across the world, adding that Olaplex products containing lilial had not been sold in the UK since January." The article quoted a "spokesperson" for Olaplex, further providing: "While this phase out is limited to the EU, out of an abundance of caution, Olaplex proactively removed lilial from our No.3 Hair Perfector globally. Since January 2022, Olaplex no longer sold products using lilial in the UK or EU.'" Importantly, these statements suggest that ***Olaplex continued to sell old product inventory containing lilial several months after the Offering and all the way into January 2022***, thereby ***risking its consumers' reproductive health***, among other things.

### *March 1, 2022 Refinery 29 Article*

201.    That same day, March 1, 2022, Refinery 29 published an article titled, "The Truth About Olaplex & Infertility," writing that "The Olaplex website even touts the product as a bestseller. That's why it came as a surprise to hear rumors bubbling over the weekend that the product would be banned."

### March 2, 2022 New York Post Article

202.    The next day, on March 2, 2022, the *New York Post* published an article titled, "Banned Olaplex ingredient linked to infertility sparks TikTok backlash." The article reported that "Olaplex is a staple at trendy upscale salons, but hair-raising rumors that a now-banned ingredient causes infertility have racked up 30 million views on TikTok." The article further stated that Olaplex "ha[d] gone viral" after the wave of social media posts in the preceding days, "evidenced by the more than 30 million views tied to the social media hashtag #olaplexno3 on TikTok alone." The article established that the public was not aware of the lilial issue until recently, writing that "*it came as a shock to the hair-obsessed that Olaplex would be revealed as an infertility risk*."

### March 3, 2022 Superior Court of Quebec Consumer Class Action

203.    On March 3, 2022, a class of Olaplex customers in Canada filed a class action lawsuit in the Superior Court of Quebec against Olaplex and Sephora Beauty Canada, Inc., alleging that Olaplex never "informed the public of the risks associated to" lilial "*including infertility, miscarriages, or disruptions in fetus development*." The Canadian class action further alleges that the Company had "apparently very discre[e]t[]ly" reformulated the No. 3 Hair Perfector product "at some point in June 2021," referencing the Company's Safety Data Sheet which was updated on June 27, 2021. The complaint also contends that "*Olaplex tried to very subtly remove this dangerous chemical* from Olaplex No. 3 Hair Repair Perfector in *June of 2021* and *hoped that its customers would never realize*. It only acknowledged and spoke publicly about the safety issues after its use of lilial in Olaplex No. 3 Hair Perfector went viral on social media in February 2022."

### March 4, 2022 Insider Article

204.    The negative news about Olaplex continued to pile on in the following days. Indeed, on March 4, 2022, *Insider* published an article titled, "Olaplex Removes Lilial After the Fragrance Was Linked to Infertility," stating that "[c]onsumers who use Olaplex, a popular haircare line, expressed

concern on social media after an ingredient in the brand's No. 3 Hair Perfector mask *was linked to a risk of fertility problems*." The article expressed that "a review by the European Union's consumer safety regulators concluded that *adding up small exposures over time could pose a health risk, particularly for individuals trying to conceive*."

### March 7, 2022 Piper Sandler Report

205.    Market analysts were transfixed by the news as well. On March 7, 2022, Piper Sandler noted in an analyst report that "[f]ollowing the No. 3 controversies that have been taking over headlines this past week," analysts were "watchful of [Olaplex's] future competitive environment." The analyst report also stated that "[w]e plan to gain further insight on all these topics on the company's Q4 call tomorrow."

206.    That same day, J.P. Morgan's analyst report stated that "*OLPX shares have been under meaningful pressure YTD* (OLPX -51.7% vs. XLP -3.4% and SPX -11.8%), *which we attribute to some combination of investor concerns* regarding an Omicron related slowdown in underlying consumption, *unfavorable headlines around past product formulations* and the broader market rotation away from growth names." The analyst report further stated that "[d]uring the earnings call at 9am ET (details below), *we believe main topics will be: removal of non-active fragrance ingredient Lilial from formulation* (link to No. 3 Q&A section) despite its relatively safe concentration, *but how management is insulating from the potential impact in its brand equity*."

207.    On this news, Olaplex's stock price fell $0.90 per share, or 5.41%, from a closing price of $16.65 per share on March 2, 2022 to close at $15.75 per share on March 3, 2022. When the market opened the following week, Olaplex's stock price fell another $1.86 per share, 11.68%, to close at $14.06 per share on March 7, 2022.

### March 8, 2022 Press Release

208.    On March 8, 2022, Olaplex filed a press release that reported the Company's financial performance for the fourth quarter of 2021 and full year ended December 31, 2021. The press release reported that net sales growth was 78.7% for the fourth quarter and 112% for the full year 2021, which beat Olaplex's guidance.

*March 8, 2022 Earnings Conference Call*

209.    That same day, Olaplex held an earnings conference call with analysts and investors to discuss the Company's financial performance for the fourth quarter of 2021 and full year ended December 31, 2021. At the beginning of the question-and-answer part of the call, Defendant Wong spoke at length about consumer and investor worries about what she called "misinformation" about lilial and Olaplex's products. Defendant Wong stated that Olaplex's No. 3 Hair Perfector had contained "very small amounts of lilial," but the lilial was "never an active or functional ingredient." Defendant Wong went on to state the following, in relevant part:

> I also want to address the misinformation surrounding OLAPLEX and lilial upfront in view of taking questions on it during the Q&A. In the last 10 days, misinformation on OLAPLEX has surfaced with regards to lilial in our products. ***We have been actively communicating across all our channels to ensure that our customers have access to the facts and to alleviate any anxiety that has been caused by this misinformation.***

> Lilial is a fragrance ingredient commonly found in beauty and household products. In September of 2020, the EU regulatory authority announced their intent to phase out the use of butylphenyl methylpropional, which is lilial, by March of 2022, out of concern that lilial when used at certain quantities could have negative impact on women's fertility and reproductive system if ingested. ***In response to the EU's phaseout of lilial, we no longer produce products with lilial.***

> Prior to the EU's phaseout, our No. 3 Hair Perfector product contained very small amounts of lilial to enhance the product's fragrance. Lilial was never an active or functional ingredient in our products. And independent medical and chemist experts have confirmed that the very small amount of lilial, 0.0119%, previously used by OLAPLEX in its [rinse-off] No. 3 Hair Perfector product, had no impact on fertility and the reproductive system.

> We have provided updated and detailed information on our website under the FAQs. There is also a link to an article citing experts from the medical and science community as well as the original study that led to the phaseout of lilial.

> We take pride in our investment in R&D and our commitment to ensuring that our products are designed and produced with the safety and health of the consumer at heart. And we will continue to abide by health and safety standards as they evolve. And as we have always been, we will continue to proactively and transparently communicate with our customers and the market to ensure they are well informed about our products.

210.    Later on the question-and-answer portion of the call, an analyst from Goldman Sachs asked about changes to Olaplex's brand reputation after the lilial news had emerged and further inquired about whether the Company had seen a drop off in sales from the social media fallout. Specifically, the analyst asked: "But even if there's not a substance behind the concerns, perception matters. Have you seen any negative impact in retail sales related to this?" Defendant Wong deflected the question by stating it was too early to tell if the lilial problem had affected sales but assured the analyst that the Company was addressing the problem "from all angles" and "on all fronts":

> *I think what I want to point you back is to the fact that we are addressing it on all fronts. It did only happen, as in my sort of early-on statement, in the last 10 days. So we are monitoring and looking at everything from all angles.* But the primary concern now is to really address all of this misinformation because you can appreciate how some of the anxiety that it has created for women when they read about infertility, and we are very happy to be able to cite experts not affiliated with OLAPLEX, not paid by us, citing that there is no impact to fertility.

### *March 8, 2022 Jefferies Analyst Report*

211.    Later that same day, after the earnings conference call concluded, Jefferies issued an analyst report that stated: "***Key sticking points from call***, based on inbound investor requests: 1) ***ingredient concern***, which [management] addressed, but didn't definitively confirm no sales impact . . .." The Jefferies report stated that the lilial problem was the biggest concern, stating: "Concern 1: EU Bans Lilial, Non-Active Fragrance Ingredient Used in Trace Amounts in Olaplex No.3. ***In a very recent flurry of media activity***, Olaplex has been drawn into a cycle of information & misinformation re: the EU's Oct-21 announced phase out of lilial, a fragrance additive used in trace amounts in Olaplex's No.3 product." The Jefferies report also stated that ***"[w]hen pressed in Q&A whether the headline effects have burdened short-term sales, management didn't directly say 'no' which left the possibility open*.**" The Jefferies report added that the market was worried about the lilial problem impacting Olaplex's DTC sales, but suggested that it was too early to make that determination to this "key risk": "Paired with Q1 sales guidance that is due to be higher than FY guide (+36%) but with DTC below, ***the market appears to be interpreting an impact to dot com sales***. This seems like a rapid jump to conclusions, but it's a key risk we now must digest in real time."

212.     Later that same day, Jefferies issued a second analyst report after speaking with Olaplex management on a call after the earnings conference call concluded. In the second report, Jefferies stated that the Company's "[*s]hares were volatile post the earnings call, down -4.6% at the close, reflecting lingering questions re: [lilial] ingredient safety* & EBITDA margin sustainability." The report elaborated: "We used our follow-up with management to get clarity on these topics which underpins our confidence in the beatability of sales expectations." In particular, Jefferies claimed that the Individual Defendants maintained that the lilial problem had not yet detrimentally affected the Company's sales: "*Points of Clarification Following Our Call with Management: 1) Lilial Ingredient Impact: In our follow-up, we confirmed that order flow and DTC sales have remained on-track through ingredient concern headlines (which peaked in late Feb)*." Despite the sales assurances, Jefferies noted that the lilial issue remained a key subject to monitor: "We continue to monitor: 1) sentiment re: ingredient concerns."

### March 8, 2022 Piper Sandler Analyst Report

213.     Likewise, in a March 8, 2022 analyst report, Piper Sandler analysts wrote that the lilial issue was a "Key Point[] from the Call," writing: "There were a number of topics covered on today's call, including management addressing the misinformation around the previous lilial ingredient in No. 3."

### March 9, 2022 J.P. Morgan Analyst Report

214.     On March 9, 2022, the following day after the press release and earnings conference call, J.P. Morgan wrote in an analyst report that the lilial problem was a key subject of the earnings conference call: "As we had anticipated, *management spent some time during the conference call addressing the recent press around the company's prior use of the lilial ingredient in the No.3 Hair Perfector*." Specifically, J.P. Morgan analysts stated in the report that they were "encouraged" by the Individual Defendants' statements during and after the earnings conference call regarding Olaplex's "brand equity" and product sales: "To that end, Ms. Wong reiterated [on the earnings call] that the product previously contained de minimis amounts of the ingredient (0.0119%) which has since been removed from the formulation (globally) prior to the EU regulatory authority's phase out by March

2022. ***Encouragingly, we note that management sounded confident during both the conference call and our follow-up conservation that the unfavorable headlines*** (which have receded relatively quickly) ***should not have a material impact on the brand's equity nor underlying consumption in 2022***."

215.    That same day, Raymond James issued an analyst report that depicted the lilial problem as the "Key Takeaway[]" from the earnings conference call, writing: "[Management] addresses recent ingredient questions. During its call, [management] addressed recent questions around the use of the fragrance enhancer lilial in Olaplex #3 following an EU ban on the ingredient that went into effect on 3/1. [Management] noted that lilial is harmful if ingested and makes up a miniscule fraction of the #3 product. It has since been removed from the product."

### April 13, 2022 MTL Blog Article

216.    On April 13, 2022, *MTL Blog* published an article that referenced the Canadian class action lawsuit, writing that the lawsuit "calls attention to one specific product, the Olaplex No. 3 Hair Repair Perfector, as it contains a 'dangerous chemical' called butylphenyl methylpropional (lilial)."

### 2022 Proxy Statement

217.    On April 19, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Findlay, Walden, Michael White, Zusi, Gurwitch, Morfitt, Mussafer, Emily White, Dagousset, Glynn, and Wong solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

218.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Findlay, Walden, Michael White, and Zusi to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered accounting firm for the Fiscal Year 2022.

219.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated the following:

> We have adopted a written Code of Conduct and Ethics, applicable to all of our directors, officers, employees and "Business Associates", which includes brand ambassadors, brand advocates, vendors and contractors performing services or carrying out activities on behalf of the Company. The Code of Conduct and Ethics is designed to ensure that our business is conducted with integrity. It covers, among other things, professional conduct,

conflicts of interest, accurate recordkeeping and reporting, public communications and the protection of confidential information, as well as adherence to laws and regulations applicable to the conduct of our business. In the event that any substantive amendment is made or any waiver is granted, the waiver will be posted on our Investor Relations website.

220.   Regarding "Risk Oversight," the 2022 Proxy Statement stated the following:

The Board has oversight responsibility for the systems established to report and monitor the most significant risks applicable to Olaplex. The Board believes that evaluating the executive team's management of the various risks confronting Olaplex is one of its most important areas of oversight. In accordance with this responsibility, the Board administers its risk oversight role directly and through its committee structure and the committees' regular reports to the Board at Board meetings. The Board reviews strategic business and corporate plans, oversees the Company's risk management and mitigation activities, monitors the administration of policies, and safeguards the integrity of the Company's business operations and financial reporting. The Audit Committee oversees financial and accounting matters, including financial reporting, disclosure, internal controls over financial reporting, ethics and compliance programs, and regulatory compliance. In addition, the Audit Committee also oversees and reviews with management the Company's policies, procedures and practices with respect to risks related to information security, cyber security and data protection. The Compensation Committee oversees and assesses the adequacy of, and any risk inherent in, the Company's compensation and benefits, as well as reviews and administers compensation programs, plans and arrangements.

221.   The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about them; and (3) although the Individual Defendants purported to furnish stock grants to executives based upon the performance of the Company, the Company's common stock was artificially inflated as a result of the false and misleading statements.

222.   The 2022 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) Defendants were engaging in and/or causing the Company to engage in the Product Safety Misconduct; (2) Olaplex's Offering was solicited on false and misleading information; (3) Olaplex was not facing the possibility of laws and regulations changing in the future, but was already

facing material events that could negatively affect Olaplex's business, operations, prospects, and overall brand reputation; (4) the Company was aware that the E.U. moved to ban lilial in August 2020 after classifying the chemical as a reprotoxic chemical with links to infertility; (5) in response to the E.U.'s impending lilial ban, Olaplex had already reformulated its No. 3 Hair Perfector product in June 2021 to remove lilial internationally, just mere months before the Offering; (6) despite reformulating No. 3 Hair Perfector to remove lilial, Olaplex chose to retain the old product inventory containing lilial on hand and continued to sell the old inventory for months, at least until January 2022; (7) as a result, the excess inventory put Olaplex, its retailers, and its distributors in a high risk position were the Company to experience a downturn in product sales; (8) Olaplex represented that the Company was highly concerned about their customers' health and well-being and strove to design "clean" products while selling products that contained a reprotoxic chemical with links to infertility; (9) as a result, Olaplex faced serious risks that the Company's brand reputation, especially by and through social media, would be significantly damaged by the E.U.'s lilial ban; and (10) Olaplex failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

223.    As a result of Defendants Findlay, Walden, Michael White, Zusi, Gurwitch, Morfitt, Mussafer, Emily White, Dagousset, Glynn, and Wong causing the 2022 Proxy Statement to be false and misleading, Olaplex shareholders voted, *inter alia*, to: (1) reelect Defendants Findlay, Walden, Michael White, and Zusi to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify Deloitte & Touche LLP as the Company's independent registered accounting firm for Fiscal Year 2022.

### May 5, 2022 Evercore Analyst Report

224.    In anticipation of the release of Olaplex's financial statements for the first quarter of 2022, which ended on March 31, 2022, Evercore issued an analyst report on May 5, 2022. The report stated the following risks:: "*1) concerns over health risk of lilial, an inactive ingredient removed from the formulation; 2) K-18*" and "*Controversy: Competitiveness of marketing strategy that only uses social media* and focuses on salons v. heavy spenders like L'Oreal." In another section of the report

titled "Competition," the Evercore analysts further noted "*investor worry about . . . competing technologies* --- Redken by L'Oreal and *more recently K18, which is generating buzz in social media, a precursor of [market] share gains. These are all legitimate worries*, and this is a sobering market."

### May 11, 2022 Press Release

225.    On May 11, 2022, Olaplex disclosed its financial statements for the first quarter of 2022, which ended on March 31, 2022, in a press release. The press release indicated that Olaplex experienced a slowdown in net sales growth, declining from the previous quarter's 79% to 58% year-over-year.

### May 11, 2022 Form 10-Q

226.    On May 11, 2022, the Company filed its quarterly report on Form 10-Q for the first quarter of 2022, which ended on March 31, 2022 ("2022 1Q 10-Q") with the SEC. Attached to the 2022 1Q 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Wong and Tiziani attesting to the accuracy of the 2022 1Q 10-Q. Defendants Wong and Tiziani signed the 2022 1Q 10-Q.

227.    The 2022 1Q 10-Q admitted that Olaplex had reformulated its No. 3 Hair Perfector product in June 2021, just three months before the Offering:

> Our cost of sales increased $20.5 million or 83.5% to $45.0 million in the three months ended March 31, 2022 from $24.5 million in the three months ended March 31, 2021, due to a $16.9 million increase driven by a growth in sales volume, *a $4.3 million increase due to the inventory write-off and disposal costs related to unused stock of a product that the Company reformulated in June 2021 as a result of regulation changes in the E.U. In the interest of having a single formulation for sale worldwide, the Company reformulated on a global basis and is now disposing of unused stock.* In addition, cost of sales was partially offset by a $0.7 million decrease in the amortization of our acquired patented formulations.

228.    The statements in ¶¶ 209-210 and 225-227 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Defendants were engaging in and/or causing the Company to engage in the Product Safety Misconduct; (2) Olaplex's Offering was solicited on false and misleading information; (3) Olaplex was not facing the possibility of laws and regulations changing in the future, but was already facing material events that

could negatively affect Olaplex's business, operations, prospects, and overall brand reputation; (4) the Company was aware that the E.U. moved to ban lilial in August 2020 after classifying the chemical as a reprotoxic chemical with links to infertility; (5) in response to the E.U.'s impending lilial ban, Olaplex had already reformulated its No. 3 Hair Perfector product in June 2021 to remove lilial internationally, just mere months before the Offering; (6) despite reformulating No. 3 Hair Perfector to remove lilial, Olaplex chose to retain the old product inventory containing lilial on hand and continued to sell the old inventory for months, at least until January 2022; (7) as a result, the excess inventory put Olaplex, its retailers, and its distributors in a high risk position were the Company to experience a downturn in product sales; (8) Olaplex represented that the Company was highly concerned about their customers' health and well-being and strove to design "clean" products while selling products that contained a reprotoxic chemical with links to infertility; (9) as a result, Olaplex faced serious risks that the Company's brand reputation, especially by and through social media, would be significantly damaged by the E.U.'s lilial ban; and (10) Olaplex failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

229. On this news, analysts signaled that a further slowdown in Olaplex's sales may be on the horizon. For instance, Bank of America's May 11, 2022 analyst report acknowledged the "disruptions" caused "by the EU ban of lilial" and the "$4.3mil of inventory writedown from lilial-related global reformulation of OLPX's No. 3 line" that Olaplex had disclosed, writing "that reiterated sales, EBITDA, and profit guide implies some moderation in expectations for the remaining quarters," although Bank of America remained "reassure[ed]" by the "continued momentum" in Olaplex's sales.

### June 22, 2022 Vogue Business Article

230. On June 22, 2022, Vogue Business published an article titled, "After viral infertility memes, can Olaplex bounce back?" that featured an interview with Defendant Wong. The article called Olaplex's handling of the lilial problem and the ensuing negative publicity an "overnight disaster." The article stated that the Company "found itself at the center of a controversy earlier this year when a [Kay] TikTok video *highlighting its use of an ingredient that was set to be banned in Europe over links to infertility* went viral." The article also stated that No. 3 Hair Perfector was vital to Olaplex's business,

noting that "Olaplex's success has been driven by focusing on less than 10 very effective products **with No. 3 among its best sellers**." The article further stated that Olaplex was especially at risk of brand reputation problems since the Company largely relied on social media chatter for marketing and advertising. In relevant part, the article noted that "[b]uilding a viral marketing machine on social media by leveraging key beauticians and hair stylist influencers was core to the brand, and now they were threatening it." Defendant Wong's comments included in the article largely corroborated this position: "'The thing with social media is that it's a double-edged sword,' Wong tells Vogue Business over a cup of tea at new London hotspot the Nomad Hotel. . . 'It can elevate you,' she says, but 'it can also be disruptive.'"

231.    The Vogue Business feature also addressed a recent Olaplex earnings conference call wherein "Olaplex told investors it had already begun phasing out lilial in Europe following the EU's ruling, and would now remove the product globally. Olaplex shares fell 6 per cent after the earnings call."[28] The article also highlighted the poor publicity following the truth about Olaplex's handling of the lilial problem in early 2022, stating "[s]till, shock and disappointment had rippled throughout the brand's online community. Some joked in memes about preferring good hair over fertility, while several others requested a refund." The article also provided that Olaplex eventually decided to rid itself of lilial products by spending "$4.3 million to dispose of existing stock" of No. 3 Hair Perfector that contained lilial.

232.    Defendant Wong conceded that investors and customers were quite concerned about the lilial problem but remained steadfast it would not be a long-term issue for Olaplex, representing that "'*[t]he impact [on sales] was very minimal*, because of the mitigating factors that we implemented,' '*When the thing first came out, we did see a lot of concerns. But, at this point in time, everything has been addressed* given that we have disposed of the inventory. We were very quick in responding.'"

233.    Despite Defendant Wong's assurances, the Vogue Business article noted that Olapex's poor social media reputation would persist, presenting "*a real risk to Olaplex*" since the Company

---

[28] The *Vogue Business* article seems to represent that the Company addressed the lilial issue during the May 11, 2022 earnings conference call. However, the lilial discussion occurred months earlier, during Olaplex's March 8, 2022 earnings conference call.

largely relied on Tik Tok and social media sites for marketing; the article referenced a Jefferies analyst and stated the following:

> Still, *the incident spells a cautionary tale for brands that rely on social media*. While Olaplex has addressed the concerns, *some posts on TikTok remain online. The posts about Olaplex's No. 3 range gained traction because of the viral nature of TikTok's algorithm*. Even with zero followers, users on the platform can get millions of views on a video and continue to do so a year later (posts on other social media platforms, such as Instagram and YouTube, haven't historically been easily discoverable and tend to have a lifespan of no more than 24 to 48 hours). "The TikTok algorithm keeps spinning whatever is hottest and driving the most clicks," says Stephanie Wissink, managing director of consumer research at investment banking firm Jefferies.

> *To date, Kay's video has over a million views and thousands of likes*. Kay did not respond to requests for comment. *Still, it's continued life online poses a real risk to Olaplex as "it's a company that positions and commercialises itself as being backed by science, so in the moments where efficacy, performance and safety are called into question, it's going to require the company to do everything they can to remediate that,"* says Wissink.

234.    Unfortunately for Olaplex, Vogue Business was right; the negative publicity surrounding the Company continued into the summer and fall of 2022 and beyond. On July 4, 2022, *Woman and Home* published an article titled, "Olaplex—what are the infertility links and is it safe?" The article stated that "Olaplex is involved in an ingredient controversy as some chemicals found in certain products have been linked to infertility," referring to the lilial problem in the No. 3 Hair Perfector product. The article further stated that the "recent controversy has concerned shoppers who are worried that their hair care products may be linked to infertility and other pregnancy issues." The article addressed the problem, stating that "lilial has been linked to infertility because the European Commission concluded that *in large concentrations it 'cannot be considered safe.'*" *Woman and Home* also wrote that use "on an individual product basis" also "would quickly become unsafe if an individual used various products within a day that contained the chemical compound." Consequently, the article suggested Olaplex's competitors' products, such as K18, instead, writing: "It's also worth saying that *there are alternative treatments on the market that you may wish to try instead, see our K18 review for our beauty editor's top hair repair mask*."

*July 12, 2022 Olaplex Hair Loss/Hair Damage? Facebook Page Emerges*

235. On July 12, 2022, a Facebook group page, titled "Olaplex Hair Loss/Hair Damage?" emerged. The page discussed, among other things, Sephora reviews for certain products and consumers' worries about hair loss resulting from the use of Olaplex haircare products. Additionally, Sephora's website, as of August 2022, was littered with consumer concerns about Olaplex and hair loss. A sampling of the comments demonstrates how extensively damaged Olaplex's reputation was:

> They supposedly reformulated without [lilial] which is an ingredient that is banned in European Union linked to infertility. Similar to BPA, phthalates, and parabens, lilial can act as an endocrine disruptor. Endocrine disruptors are chemicals that may mimic or interfere with the body's hormones – which is why Too much estrogen causes hair loss and thinning hair. OLAPLEX says they have removed lilial from it's product as of January 2022 – Check when you purchased it and throw away if you see butylphenyl methylpropional as an ingredient on your bottle.

### *August 9, 2022 Press Release*

236. On August 9, 2022, Olaplex issued a press release that reported the Company's financial performance for the second quarter of 2022, which indicated a further slowdown in net sales growth. Net sales growth fell to 38.6% year-over-year as compared to 57.6% in the second quarter of 2021.

### *August 9, 2022 Earnings Conference Call*

237. That same day, Olaplex held an earnings conference call to discuss the second quarter of 2022 financial results. During the call, Defendant Wong suggested that Olaplex did not see any heightened competition, stating:

> *We also continue to see a normal level of competitive intensity, which is healthy for a high-growth category.* As the creator of the bond-building category, and as the only brand using patent-protected Bisamino technology to truly repair hair bond from the inside out, we stand to gain the most from growing awareness of the category. *While we do not expect the category to be immune for potential pressure related to an economic slowdown, we also believe that current sentiment for the category and OLAPLEX remains strong.*

238. Also during the call, Defendant Tiziani admitted that Olaplex retained "higher" amounts of inventory, stating:

> Inventory at the end of Q2 2022 was $140.3 million compared to $98.4 million at year-end 2021 and $117.5 million at the end of Q1 2022. *We have strategically maintained a higher level of inventory months on hand* to support the growth in our business, compensate for longer transit times overseas and to help mitigate macro supply chain

risks. We remain comfortable with our inventory position and our ability to meet future demand.

239.   When an analyst asked a follow up question about Defendant Tiziani's inventory comments, he responded that Olaplex made the decision halfway through 2021—indicating it occurred at the same time the Company reformulated No. 3 Hair Perfector and just three months before the Offering:

> We're happy with the level and quality of the inventory we have on hand. It's been a big part of our strategy to maintain excellent customer service, which we've been able to do over the past several years. ***And that means we made a strategic decision to hold more months on hand of inventory. We made that decision way back in the middle of last year.*** It served us very well. That's exactly what we're continuing to do here. And that month on hand level of inventory remains pretty stable.

240.   On this news, Olaplex's common stock fell $1.68 per share, or 9.99%, from a close of $16.31 per share on August 8, 2022 to close at $14.68 per share on August 9, 2022.

### *August 10, 2022 Barclays Report*

241.   Analysts quickly responded to Olaplex's sales slump. On August 10, 2022, Barclays wrote that **"[o]ur concerns around a slowdown in the U.S. proved valid,"** and with "anticipating decelerating growth, we believe the path ahead, at least from a share price standpoint, could prove challenging."

### *August 10, 2022 Bank of America*

242.   Likewise, Bank of America wrote the following in an August 10, 2022 analyst report: "1) **Sequentially flat Specialty Retail** ahead of moderate elasticity from 5.5pts of pricing starting 3Q; 2) **Direct-to-Consumer (DTC) slowdown continuing with 8% sequential decline vs 1Q**; and 3) Gross margin contraction of - 550bps YoY was 300bps worse than BofAe from mix and higher logistics costs."

### *September 8, 2022 New York Times Article*

243.   On September 8, 2022, *The New York Times* published an article titled "What's Going on With the Magical Mystery Shampoo?" *The New York Times* wrote that "Earlier this year, the same platforms that helped turn Olaplex into a household name hosted far less friendly content: A TikTok

video that went viral said that the European Union and Britain would ban Olaplex No. 3 for containing lilial, an ingredient used in trace amounts as a fragrance — and linked to infertility." The article also stated that the No. 3 Hair Perfector was "the company's top-selling product," and stated that Olaplex had to "destroy[] $4.3 million worth of inventory" of the No. 3 Hair Perfector product after "announcing a reformulation."

244.     The article also spoke about consumer dismay about hair loss and health effects of lilial, reporting that "[b]ut for all the customers who think the products are capable of necromancing their hair, there is also dissent: unhappy customers, skeptical chemists, disillusioned colorists. Sephora.com has dozens of one-star reviews for Olaplex, some blaming the oils and creams for damage, many just saying the products don't live up to the hype." The article explained that Olaplex endured heightened competition, noting that "[s]ome stylists note that there are several Olaplex competitors, like Wella BlondorPlex, which was introduced in 2020 and includes a bond builder already mixed in with the color. Many also favor K18, another bond-building treatment that takes just minutes and doesn't need to be rinsed out or repeated as often." The article included a quote from a former Olaplex customer who had recently switched to K18 after being "tempted by Instagram ads." The article also suggested that Olaplex had previously "hinted at an expansion into skin care" as "other options," and reasoned that "[t]he company may need them" now that the Company was facing so many issues with its haircare products.

### *September 29, 2022 Piper Sandler Analyst Report*

245.     On September 29, 2022, Piper Sandler released an analyst report that downgraded Olaplex shares "as a result of further work . . . [that] revealed that competition and misinformation pose growing risks to the company." The report discussed survey results of 150 salons in the top 50 U.S. metropolitan areas, concluding that the Company's market share was shrinking as "[c]ompetition has and continues to be on the rise in the hair repair category, particularly K18, which has risen to the #2 alternative hair repair product in our survey." The report directly attributed the sales slump and market share loss to the lilial problem and the ensuing related negative reviews discussing hair damage, which the report called "misinformation" that started in the beginning of 2022. The report stated "[b]ut, why

are people switching from Olaplex? Mainly misinformation," writing that consumers were "listening to what's most buzz-worthy on social media." The report continued:

> *A key factor we see driving this competitive growth and shift away from Olaplex is a notable amount of misinformation out there.* As we show below from our September Olaplex Salon Survey, there were a number of negative reviews mentioned by the hair stylists surveyed, however a number of these reviews are a result of error or misinformation. . . . Additionally, we believe that [product] misuse could be leading to some other *negative reviews we're seeing regarding damage, such as dryness, breakage, and hair loss*.

> \*\*\*

> *The quick spread of misinformed infertility concerns arising from the lilial ingredient in No. 3 (back in late-February/early March) is a clear example of how quickly negative press can spread*, and while we applaud management's quick actions to put out the fire, this does show the power of the press. Recall, OLPX stock dropped ~6% the day the issue was brought to the public eye via social media.

**Lowering Forward Estimates**

> So, where do we go from here? While we understand our survey work is not representative of the entire population, we do view it as a good indicator of general trends. *Some salons are stopping use and sales of Olaplex products, competition is certainly growing, and there are clear concerns out there arising from misinformation*. We believe heavier investments in marketing and education are needed from Olaplex to offset these headwinds. As such, we are lowering our forward estimates today on both the top and bottom lines, and we are now sitting below the Street across all metrics.

246.   The Piper Sandler analyst report further stated that analysts were "more cautious on OLPX given some of the risk factors that have come up, particularly negative reviews" pertaining to hair loss. Piper Sandler further stated that "marketing and education spend will need to increase notably to correct these misconceptions and slow share loss to competitors."

247.   On this news, Olaplex's common stock fell $1.33 per share, or 12.15%, from a close of $10.95 per share on September 28, 2022 to close at $9.62 per share on September 29, 2022.

***October 18, 2022 Press Release***

248.   On October 18, 2022, Olaplex issued a press release that reported the Company's preliminary financial results for the third quarter of 2022, ended September 30, 2022. The press release reported that the Company's sales had continued to slow, with net sales growth of just 9.2% in the third quarter of 2022, and with sales decreasing 4% in the U.S., Olaplex's largest market. Accordingly, the

Company announced that it would have to lower guidance for the Fiscal Year 2022, reducing its annual sales range to between $704-$711 million, which was **more than $100 million less than its previous forecast range** of $796-$826 million. The press release blamed the sales slowdown partly on "increased competitive activity including discounting, and a moderation in new customer acquisition." The press release also contained a statement from Defendant Wong that stated, "[w]e are disappointed to lower our fiscal 2022 guidance" and that the Company had "identified and put actions in place to accelerate demand."

### October 18, 2022 Form 8-K

249.    That same day, on October 18, 2022, Olaplex filed a Form 8-K with the SEC which disclosed that Defendant Walden was resigning from her COO role at Olaplex, effective immediately.

### October 18, 2022 Earnings Conference Call

250.    Later that same day, Olaplex held an earnings conference call with investors and analysts to discuss the Company's reduced guidance for Fiscal Year 2022. During the call, Defendant Wong blamed the sales "slowdown" partially on "pressure on [the Company's] ability to attract new consumers," "increased competitive activity" and "inventory rebalancing across partners[,]" stating:

> We believe there are two key reasons for the change in growth trajectory. **First, we have seen a slowdown in sell-through momentum.** We believe this has been driven by a combination of factors, including macroeconomic pressures have impacted both PRO stylist and consumers with the most pronounced impact being on our U.S. PRO stylist. U.S. Pros are buying less and buying closer to need as they report clients lengthening the time between salon visits and spending less for services and take-home products.
>
> **In addition, we have seen increased competitive activity in our highly attractive core bond building space. Both new comers and large hair care incumbents have extended into our category and have intensified promotional behavior**. Olaplex has made a strategic decision to avoid over promotion. Instead, prioritizing spending behind long-term sustainable brand health.
>
> In this context, it is important to note that we do not believe that any of our competitors represents a lasting threat to our competitive position. Moreover, while we believe our customer retention is best in class, the macroeconomic impact and **competitive activity has put pressure on our ability to attract new consumers to the brand. The second driver of our change in performance is inventory rebalancing across partners**. Our retail, DTC and PRO B2B customers are experiencing the same macroeconomic pressures and being impacted by the same sell-through trends. While at the same time, increasing their confidence in the supply chain.

251.    Later on the call, Defendant Tiziani stated that the sales slowdown was largely due to the Company's DTC area, due to increased competition, representing the following to investors:

> In Q3, the miss to our expectations and shipments was disproportionately driven by 2 customer groups: U.S. professional and a U.S. pure-play e- commerce customer within DTC. These linked to the *year-over-year sales declines in the professional and DTC channels as well as the pressure we saw specifically in the U.S. We saw a reduction in U.S. professional orders* as we believe macroeconomic concerns are impacting the stylist community and *our key distributors chose to pull back on inventory levels in response to the lower sell-through trends*. Despite this, for third-party data, which we receive on a 1-quarter lag, I want to stress that through the second quarter, we are still gaining market share year-over-year in the U.S. professional channel.
>
> *We've also seen a deceleration of sell-through trends in the U.S. retail and DTC channels related to slower market growth and increased competitive activity, including from discounting. In the third quarter, this was most acutely felt at a key U.S. DTC customer, which reduced orders to lower inventory levels, in part due to slower sell-through and in part to meet lower targeted levels of inventory on hand*. I will also note that Q3 net sales in retail, DTC and our International Professional business, benefited from a higher selling of holiday kits in 2022 versus 2021, which is part of what's driving retail, DTC and international net sales growth to be stronger in Q3 than our projection for Q4.

252.    Defendant Tiziani also stated that Olaplex would "alter" its prior year decision to retain more inventory by "lower[ing] our own inventory to target levels."

**October 19, 2022 Barclays Analyst Report**

253.    Analysts were astounded by these developments. The very next day, on October 19, 2022, Barclays downgraded Olaplex from equal-weight to underweight because of  "lack of near-term visibility," and stated that analysts were "*taken aback by the absence of any commentary around how the company severely misread the changing realities of its operating environment*." Barclays further explained that analysts were previously "*concerned about decelerating growth in the US*" but "did not expect to see such a *sudden and dramatic change in trend just two months later*." Barclays also stated that the "resignation of COO Tiffany Walden is concerning," calling into question the "viability and risk profile of having one person called on as Head of Sales, Chief Legal Officer & Chief Operating Officer." Barclays further stated that it was "reasonable to assume headwinds to new customer acquisition persist at least into 1Q23 . . . and *sales decline through 1H23*."

***October 19, 2022 Morgan Stanley Analyst Report***

254.    Likewise, Morgan Stanley wrote in an analyst report that same day that it had downgraded Olaplex to equal-weight from overweight, stating that inventory retention changes made by retailers spawned "low visibility." Morgan Stanley analysts also stated the "magnitude of pressure is much greater than [] expected," citing "weaker consumer demand due both to macro weakness and competitive impacts, as well as inventory reductions."

255.    On this news, Olaplex's common stock cratered, falling $5.55 per share, or 56.69%, from a close of $9.79 per share on October 18, 2022 to close at $4.24 per share on October 19, 2022.

***November 9, 2022 Press Release***

256.    On November 9, 2022, Olaplex issued a press release that reported the Company's financial results for the third quarter of 2022, ended September 30, 2022. The press release reported that the Company's sales had again slowed, with net sales growth of just 9.2% in the third quarter of 2022, with sales decreasing 4% in the U.S., Olaplex's largest market.

***November 9, 2022 Earnings Conference Call***

257.    That same day, Olaplex held an earnings conference call with investors and analysts to discuss the Company's third quarter financial results and address remedial actions Olaplex was taking to restore its sales. During the call, Defendant Wong stated that Olaplex sought to "provide a more stable foundation" in the future, representing the following:

> We continue to have the #1 selling [SKUs] sold through salons in the U.S. in each subcategory. Shampoo, conditioner and styling has decline[d] through the second quarter of 2022. We have increased investment for the fourth quarter in building awareness across the stylist community in the key markets of the U.S., U.K., Australia and France. We have also partnered with new chains and key opinion leader salons in the U.S. and Canada to further drive awareness, PR and sales. ***We have proactively taken steps to rebalance inventory at one of our key U.S. distributors to improve overall inventory mix and provide a more stable foundation for 2023.***

258.    Later on the call, Defendant Tiziani stated that the "softer demand" Olaplex was seeing in the U.S. was partly because of increased competition, representing the following:

> Professional channel sales ***declined 16%*** to $63 million ***versus a 58% increase last year***, as our U.S. distributor partners reduced purchases to adjust inventory levels given ***softer demand from stylists***, which we believe is partially driven by macroeconomic concerns.

*And our direct- to-consumer channel sales were down 2.6% to $39.3 million, following an 87% increase last year, due to slower sell-through related to weakening market growth and increased competitive activity, including discounting.*

*In the third quarter, we also saw a key U.S. DTC customer reduce orders to meet lower targeted levels of inventory on hand*. By geography, international led our growth with a 27.8% increase driven by strong contributions from the U.K., Italy, France, Germany, Canada and our emerging cross-border e-commerce business in China. *The U.S. declined 4.3%, driven by the aforementioned pressures in the professional and DTC channels.*

259.    Defendant Tiziani went on to say that Olaplex would be reversing its strategy regarding inventory from its pre-Offering stance of retaining higher inventory to cutting inventory levels as product demand waned:

Now turning to the balance sheet. Inventory at the end of the third quarter was $151.3 million compared to $140.3 million at the end of the second quarter and $98.4 million at the end of 2021. *As mentioned on our October call, this is higher than originally planned due to our lower sales delivery in the quarter.* We have already altered our sourcing plans and slowed procurement to match the new sales forecast. Over time, this will lower our own inventory to target levels, and the timing of this will depend on sell-through trends.

***

As it relates to the fourth quarter, while we have actions in place to accelerate growth, *we are still planning for an increasingly difficult macroeconomic operating environment and for further inventory rebalancing by several key customers related to our slower sales momentum.* Based on today's macro environment and our current forecast, we expect this inventory rebalancing to normalize by the end of the first quarter 2023 in our professional and specialty retail channels.

260.    Defendant Tiziani also stated that he expected the sales slowdown to extend into the fourth quarter of 2022, noting:

As a reminder, our guidance for Q4 also reflects that *we will not be able to lap the robust sales lift that we experienced during the fourth quarter holiday period last year when we grew 78%*, benefiting from significant replenishment orders across our specialty retail and DTC channels at a time when we believe *consumer demand was stronger* and some of our competitors struggled with consistent supply.

261.    During the question-and-answer part of the earnings conference call, numerous analysts addressed Olaplex's lackluster sales. An analyst from Evercore stated that "it sounds like September really slowed down a lot" and that it was "a pretty bad September." The Evercore analyst then asked for more details on how that occurred, to which Defendant Tiziani answered that "[c]learly, we did see a

slowdown in September" and further represented that Olaplex was putting in "marketing activations," which the Company hoped would boost demand. Similarly, a Goldman Sachs analyst stated: "Clearly, we all got a little too enthusiastic and excited about the sales trajectory of the business," further stating that there was "a cohort of consumers who probably . . . *came in because there was hype behind [Olaplex's products],* right? Like it was a shiny new toy. *And now, there are other shiny toys that are out there*." Defendant Wong retorted that the Olaplex "brand fundamentals are strong," and that consumers are "*looking for brands that they can trust*, not just on marketing hype or promises that they cannot deliver."

### November 10, 2022 J.P. Morgan Analyst Report

262.    Analysts were disappointed after the November 9, 2022 earnings call. On November 10, 2022, J.P. Morgan analysts stated, "we believe the company will face challenging four quarters head with deep deceleration in sales performance in Q322, followed by negative sales growth in Q422. The increased competition and excess inventory at OLPX and retailers will likely remain a significant headwind over the next 12 months."

263.    On February 9, 2023, a class of consumers filed a product liability lawsuit captioned *Michelle Albahae et al v. Olaxplex Holdings, Inc. et al* in the United States District Court for the Central District of California against Olaplex alleging negligence and false advertising on grounds that Olaplex's products contained allergens and irritants, including lilial, that triggered hair loss and damage to hair and scalps.[29] The suit included allegations that the Company's products were not safe because of lilial, which the E.U. had banned due to fertility and reproductive concerns, and that Olaplex thus had removed lilial from the Olaplex No. 3 Hair Perfector product ingredient list in June 2021.

### February 10, 2023 BestLife Article

---

[29] On March 2, 2023, Michelle Albahae and 100 other individuals filed the complaint. On April 17, 2023, Olaplex filed a motion to sever and dismiss all non-California plaintiffs' claims. On June 15, 2023, the court issued an order explaining that severance appeared appropriate for all plaintiffs rather than just the non-Califonria plaintiffs because the plaintiffs' claims do not arise from the same transaction or occurrence. The court ordered Olaplex and plaintiffs to show cause in writing why the court should or should not sever and dismiss all plaintiffs, except Albahae, from the action. The court granted Olaplex's motion to sever all plaintiffs except Albahae, therefore dismissing all plaintiffs (except Albahae) without prejudice.

264.    The lawsuit's filing triggered more damaging publicity for Olaplex. The day after the lawsuit was filed, on February 10, 2023, *BestLife* published an article titled "Popular Hair Care Brand Olaplex Under Fire for Allegedly Causing Hair Loss," which stated that "Olaplex is facing a lawsuit from a group of customers who allege that these products cause hair loss." The article spoke about the lilial problem:

> [T]he plaintiffs claim that Olaplex knowingly uses ingredients that make products 'unreasonably dangerous.' ***Lilial***, which can cause allergic reactions, was used in Olaplex products until last year, Insider reported. The chemical was banned from hair products in the European Union in 2020. ***Olaplex removed lilial (which can also cause infertility issues) in 2021***, and put out a new formulation in 2022, per Today.

### February 15, 2023 CBS News MoneyWatch Article

265.    On February 15, 2023, CBS News's MoneyWatch published an article about Olaplex which stated, "a group of roughly 30 consumers sued the hair care brand ***alleging that its products damaged their hair and scalps and left them with bald spots***." The article went on to say that "Olaplex products contain ingredients called '***lilial***' and 'panthenol' that can lead to conditions causing hair loss and scalp injuries, including 'inflamed, blistered, flaking or scaling skin.' Lilial is banned from hair and beauty products in Europe."

### February 16, 2023 BBC Article

266.    On February 16, 2023, the BBC published an article titled "Olaplex products cause hair loss, lawsuit says," which reported that the lawsuit alleged that "Olaplex products contain lilial and panthenol - chemical compounds that can lead to hair loss and conditions including 'inflamed, blistered, flaking or scaling skin.' Lilial was once used as a perfume in cosmetics, until the European Union banned it from March 2022 due to its impact on fertility."

### February 16, 2023 NPR Article

267.    That same day, NPR published an article titled, "Nearly 30 women are suing Olaplex, alleging products caused hair loss." The article stated, "[a]ccording to the complaint, multiple Olaplex products contained lilial, a chemical compound that is often used as a perfume in cosmetics until the European Union mandated the ingredient be gone from products by March 2022 due to concerns about its impact on fertility."

***February 16, 2023 Press Release***

268.    On February 28, 2023, Olaplex issued a press release that reported the Company's fourth quarter of 2022 and Fiscal Year 2022 financial results. Per the release, net sales fell by 21.5% for the fourth quarter of 2022 but there was a modest 17.7% increase in net sales for Fiscal Year 2022, as compared to 112% net sales growth for the year prior.

## The Truth Fully Emerges

***February 28, 2023 Earnings Conference Call***

269.    The truth fully emerged on February 28, 2023 when Olaplex held an earnings conference call with investors and analysts to discuss the Company's fourth quarter of 2022 and Fiscal Year 2022 financial results. During the call, Defendant Wong stated that the Company had to "reset and stabilize [its] core business with a long-term view":

> As disclosed in today's press release, following multiple years of strong growth, ***we expect 2023 net sales down 15% from last year and adjusted EBITDA down 32%,*** in each case, at the midpoint of our annual guidance range. This expectation follows an analysis of recent business trends, the issues we face and the growth opportunities in front of us. Based on this work, we realize that we need to invest more to keep pace with our rapid growth and current scale. As we look at our plan for 2023 with macro uncertainties and quickly changing market dynamics, reducing visibility, ***we see the need to reset and stabilize our core business with a long-term view. We are disappointed with this outlook*** and hold ourselves accountable for getting to this position and for improving the business. ***This year, we have a clear focus on increasing investments in sales and marketing, education and our partner relationships,*** and we believe this initiative will optimize our potential and position Olaplex to resume growth in 2024 and beyond.

270.    Defendant Wong also "acknowledge[d]" the "lessons learned" from the Company's poor 2022 financial results, stating that Olaplex needed to do more "to defend the brand from the natural competitive intensity that exists in an attractive category" and that "we need to act faster and be better equipped to deal with negative PR and misinformation about our brand, such as has surfaced over the past year." Defendant Wong also stated that "[a]nother ***key objective*** this year will be increasing our education and training efforts on the Olaplex brand," particularly in "marketing our core products with an anchor around ***No. 3 as our hero SKU***." Regarding the No. 3 Hiar Perfector, Wong stated that Olaplex needed to exploit "opportunities to better educate on the product and how it is utilized."

271. Also during the call, Defendant Wong stated the following about the "negative media headlines" surrounding the Company:

To that end, I want to address *the recent negative media headlines that claims Olaplex products cause hair loss*. So anyone experiencing hair loss and hair breakage, we understand the emotional toll it has and are empathetic to the impact on your well-being. However, Olaplex products do not cause hair loss or hair breakage. Olaplex products are safe and effective as millions of our consumers can happily attest and as evidenced by our published HRIPT test results. *We also recognize the concern that this misinformation may cause our loyal customers, stylists and retail partners* when hearing baseless claims about a product they love and trust.

272. Later on the call, Defendant Tiziani stated that Olaplex's poor fourth quarter of 2022 finanical results were "*negatively impacted by approximately $29 million at several of our key customers* as these customers lowered their orders to rebalance inventory *in response to lower levels [of] demand* and to target overall lower levels of month on hand than previously carried." Defendant Tiziani attributed the sales shortfalls to less consumer "demand in an increasingly competitive environment":

By Channel, professional sales declined 3.9% to $54.9 million versus a 9% increase last year, which was in line with our expectations. *This decline was driven by reduced purchases by our stylist community in the U.S. and the U.K., partially driven by the tougher macro environment impacting the professional channel*. This was evidenced by the latest available Klein data, which showed total market front of salon sales in the U.S. declined by 2% in the third quarter, while Olaplex front of sale sell- through in the third quarter was up 2% compared to last year. Specialty Retail sales decreased 45.3% to $32.6 million, following a robust 332% gain in the prior year period. *Performance was below the expectations we provided on our third quarter call, reflecting a softening in replenishment demand in an increasingly competitive environment, including heightened promotional activity during the holiday season*. In addition, as we previously communicated, we were lapping the $15 million initial wave of Ulta pipeline fill in Q4 2021.

273. Defendant Tiziani further stated that the Company was still working to reduce excess inventory, representing the following:

Inventory at the end of the fourth quarter was $144.4 million, down from $151.3 million at the end of the third quarter. *The reduction in inventory levels as a result of our decision to alter our sourcing plans and slow procurement to match the new sales forecast*, which more than offset building inventory of new SKUs as we prepare for product launches this year.

274.    On this news, Olaplex's common stock fell $0.49 per share, or 9.06%, from a close of $5.41 per share on February 27, 2023 to close at $4.92 per share on February 28, 2023.

**<u>Subsequent Developments</u>**

275.    Unfortunately for Olaplex, the Company remains plagued by a reputational crisis stemming from the lilial problem. For example, when "Olaplex lilial" was input into the Google search engine on November 8, 2023, Google returned the following:



276.    Outcry on social media continues as well. On Tik Tok, hashtags such as "#olaplexlilial, #olaplexhairloss, #olaplexban, #olaplexlawsuit, and #olaplexinfertility" have all trended on the platform. Other websites, such as Trustpilot, which reviews companies, has 354 reviews of Olaplex as of November 8, 2023.[30] In total, Olaplex's reviews, out of a five-star scale, averaged 1.8 stars, with 70% of users giving Olaplex a 1-star rating.

277.    In the financial markets, the Company's reputation still languishes as well. For example, on March 15, 2023, *Seeking Alpha* published an article titled, "Olaplex: Ongoing Struggle Is No Surprise." The article stated the following, in relevant part:

> Interestingly, ***Olaplex spent a significant amount of time on the fourth quarter earnings call discussing negative PR and misinformation***. This would suggest that claims of Olaplex causing hair loss have been damaging consumer perception of the product. Whether there is any substance to the claims may not matter, ***recovering from this type of damage could be difficult.***

---

[30] https://www.trustpilot.com/review/olaplex.com.

278.    The article further stated that "[a] number of data points suggest that Olaplex's brand awareness and customer acquisition has stalled, indicating a problem that goes beyond just softer end market demand."

279.    Approximately one month later, on April 16, 2023, *Seeking Alpha* published another article, titled "Olaplex: Poor Momentum In A Complex Market," which stated that Olaplex had put "too much reliance on social media." The article stated that Olaplex began through popularity on social media, like when the Company achieved 2 million followers on Instagram "at the drop of a hat," with "many influencers promot[ing] the brand on their accounts," including Kim Kardashian and Katy Perry. Despite this, the article stated: "their brand prevalence has always depended on social media popularity, which has been a double-edged sword. Indeed, the most recent products didn't go down well, and the word was spread on social media. Furthermore, contrary to some months ago, Olaplex has lost some popularity on social media. As a result, the last year was worse than expected, and next year is expected to be dismal." The article also discussed the consumer class action lawsuit against Olaplex due to safety and hair loss allegations, stating: "***the Company is facing a lawsuit, accused by one hundred people of inducing hair loss***," "accusations [that] always harm their reputation." Regarding competition, the article additionally stated that Olaplex's patent-protected products, such as Olaplex's bis-amino, are "usually insufficient" to squash competitor companies. In contrast to how the Individual Defendants portrayed Olaplex's competitive advantages in the Registration Statement, the *Seeking Alpha* article stated that "Olaplex lacks competitive advantages" and further noted the following:

> The results were surprising. ***Almost every hairdresser knew K18 and thought it was better than Olaplex***. Finally, I asked my hairdresser about both products, and he said that K18 was way better than Olaplex because of the nature of the products. Effectively, they are both in charge of hair repair, but they act completely differently.

280.    The article concluded by stating that K18 is "much more effective than Olaplex."

281.    Since Olaplex's Offering in late September 2021, Olaplex's stock has lost almost all value. At the conclusion of the Offering on September 29, 2021, Olaplex's stock traded at $21.00 per share. As of November 8, 2023, Olaplex's stock traded at ***$1.77 per share, marking an 84% loss in value***.

**Insider Sales**

282.   Defendants Mussafer, Glynn, and Michael White made insider sales, detailed above, by and through their control of Defendant Advent, the controlling shareholder of Olaplex, at prices artificially inflated by the false and misleading statements at issue for collective proceeds of $1,572,293,876.

283.   Those sales occurred shortly after the Individual Defendants caused the Company to issue false and misleading statements and therefore contribute to an inference that these Individual Defendants knew of the falsity of the statements and were cashing in while the Company's common stock continued to trade at artificially inflated prices.

284.   For instance, Defendants Mussafer, Glynn, and Michael White caused Defendant Advent to sell 68,711,029 common shares on October 4, 2021, just days after the Company held its IPO that was largely supported by the Registration Statement, which contained false and misleading statements.

285.   Then, just four days after the first sale, Defendants Mussafer, Glynn, and Michael White caused Defendant Advent to sell another 10,306,655 Company shares on October 8, 2021 for a profit of $205 million.

286.   The timing and amounts of these insider sales, made just after Olaplex's IPO, which Defendants Mussafer, Glynn, and Michael White orchestrated, while the price of the Company's common stock was artificially inflated, further demonstrate that the Individual Defendants, including those who served on the Board, knew of the falsity of the statements made and that those Individual Defendants who made insider sales were using this knowledge to enrich themselves while the Company's common stock remained artificially inflated.

**DAMAGES TO OLAPLEX**

287.   As a direct and proximate result of the Individual Defendants' conduct, Olaplex has lost and expended, and will lose and expend, many millions of dollars.

288.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

289.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

290.     Such expenditures also include, but are not limited to, losses of revenues caused by customers' loss of trust in the Company's business and products. Moreover, such expenditures include, but are not limited to, the more than ***$1.5 billion*** in proceeds that various of the Defendants received as a result of selling shares of Company common stock on inside information while the stock was artificially inflated as a result of Defendants' false and misleading statements referenced herein.

291.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Product Safety Misconduct.

292.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

293.     As a direct and proximate result of the Individual Defendants' conduct, Olaplex has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

294.     Plaintiff brings this action derivatively and for the benefit of Olaplex to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Olaplex, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act and Securities Act, as well as the aiding and abetting thereof.

295.     Olaplex is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

Verified Shareholder Derivative Complaint

296.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Olaplex. Plaintiff will adequately and fairly represent the interests of Olaplex in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

297.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

298.     A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following ten individuals: Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi (the "Director-Defendants") and non-party John Bilbrey (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was commenced.

299.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts while causing Olaplex to engage in the Product Safety Misconduct. This renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

300.     Moreover, just days after causing Olaplex to conduct the Offering, three of the Director-Defendants caused Defendant Advent, Olaplex's controlling shareholder, to engage in insider trading, which unjustly benefitted controlling shareholder Defendant Advent—and, through their controlling positions at Defendant Advent, Defendants Mussafer, Glynn, and Michael White—to the tune of *$1.5 billion* in proceeds. Moreover, each of the Director-Defendants (i.e., Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi) solicited the false and misleading 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, reelect Director-Defendants Findlay, Michael White, and Zusi to the Board, thus allowing them to continue breaching their fiduciary duties to Olaplex.

301. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and to participate in the Product Safety Misconduct alleged herein. The fraudulent schemes were, *inter alia*, intended to make the Company appear more profitable and attractive to investors and to improperly benefit Director-Defendants Mussafer, Glynn, and Michael White, and Defendant Advent. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

302. Additional reasons that demand on Defendant Dagousset is futile follow. Defendant Dagousset has served as a Company director since August 2021 and as the Chair of the Board since August 2021. She also serves as a member of the Compensation Committee. The Company also provides Defendant Dagousset with handsome compensation, including $410,001 in Fiscal Year 2022. Defendant Dagousset was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As the Company's trusted Chair of the Board, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Dagousset is a defendant in the Securities Class Action. For these reasons, too, Defendant Dagousset breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

303. Additional reasons that demand on Defendant Findlay is futile follow. Defendant Findlay has served as a Company director since August 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee. The Company provides Defendant Findlay with handsome compensation, including $265,007 in Fiscal Year 2022. Defendant Findlay was ultimately responsible

for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Findlay is a defendant in the Securities Class Action. For these reasons, too, Defendant Findlay breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

304.   Additional reasons that demand on Defendant Glynn is futile follow. Defendant Glynn has served as a Company director since August 2021. She also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Glynn with handsome compensation, including $300,007 in Fiscal Year 2022. Defendant Glynn was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Defendant Glynn also engaged in insider trading, profiting Defendant Advent, her employer and controlling shareholder of Olaplex, by approximately $1.5 billion while the Company's stock was trading at artificially inflated prices because of the Individual Defendants' false and misleading statements. Moreover, Defendant Glynn is a defendant in the Securities Class Action. For these reasons, too, Defendant Glynn breached her fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

305.   Additional reasons that demand on Defendant Gurwitch is futile follow. Defendant Gurwitch has served as a Company director since August 2021. She also serves as a member of the Audit Committee. The Company provides Defendant Gurwitch with handsome compensation, including $266,773 in Fiscal Year 2022. Defendant Gurwitch was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Gurwitch is a defendant in the Securities Class Action. For these reasons, too, Defendant Gurwitch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

306.   Additional reasons that demand on Defendant Morfitt is futile follow. Defendant Morfitt has served as a Company director since August 2021. She also serves as the Chair of the Audit Committee. The Company provides Defendant Morfitt with handsome compensation, including $280,007 in Fiscal Year 2022. Defendant Morfitt was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Morfitt also engaged in insider trading, profiting Defendant Advent, her employer and controlling shareholder of Olaplex, by approximately $1.5 billion while the

Company's stock was trading at artificially inflated prices because of the Individual Defendants' false and misleading statements. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Morfitt is a defendant in the Securities Class Action. For these reasons, too, Defendant Morfitt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

307.   Additional reasons that demand on Defendant Mussafer is futile follow. Defendant Mussafer has served as a Company director since August 2021. He also serves as a member of the Compensation Committee. The Company provides Defendant Mussafer with handsome compensation, including $260,007 in Fiscal Year 2022. Defendant Mussafer was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which he signed, and the 2022 Proxy Statement, which he solicited. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mussafer also engaged in insider trading, profiting Defendant Advent, his employer and controlling shareholder of Olaplex, by approximately $1.5 billion while the Company's stock was trading at artificially inflated prices because of the Individual Defendants' false and misleading statements. Additionally, he breached his fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Mussafer is a defendant in the Securities Class Action. For these reasons, too, Defendant Mussafer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

308.   Additional reasons that demand on Defendant Emily White is futile follow. Defendant Emily White has served as a Company director since August 2021. She also serves as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Emily White with handsome compensation, including $260,007 in Fiscal Year 2022. Defendant Emily White was

ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Emily White is a defendant in the Securities Class Action. For these reasons, too, Defendant Emily White breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

309.    Additional reasons that demand on Defendant Michael White is futile follow. Defendant Michael White has served as a Company director since August 2021. He also served as a member of the Audit Committee from August 2021 until July 19, 2022. The Company provides Defendant Michael White with handsome compensation, including $258,241 in Fiscal Year 2022. Defendant Michael White was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which he signed, and the 2022 Proxy Statement, which he solicited. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Michael White also engaged in insider trading, profiting Defendant Advent, his employer and controlling shareholder of Olaplex, by approximately $1.5 billion while the Company's stock was trading at artificially inflated prices because of the Individual Defendants' false and misleading statements. Additionally, he breached his fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Michael White is a defendant in the Securities Class Action. For these reasons, too, Defendant Michael White breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

310.    Additional reasons that demand on Defendant Zusi is futile follow. Defendant Zusi has served as a Company director since August 2021. She also serves as a member of the Audit Committee. The Company provides Defendant Zusi with handsome compensation, including $265,007 in Fiscal Year 2022. Defendant Zusi was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement which she signed, and the 2022 Proxy Statement, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, she breached her fiduciary duties by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Moreover, Defendant Zusi is a defendant in the Securities Class Action. For these reasons, too, Defendant Zusi breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

311.    Additional reasons that demand on the Board is futile follow.

312.    Moreover, as described above, Director-Defendants Mussafer, Glynn, and Michael White directly engaged in insider trading, in violation of federal law. While in possession of material, non-public information, Director-Defendants Mussafer, Glynn, and Michael White, through their employment in and control of Defendant Advent, received proceeds in excess of $1.5 billion as a result of two insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Director-Defendants Mussafer, Glynn, and Michael White's insider sales coincided with the Company making false and misleading statements before and during Olaplex's IPO. Therefore, demand in this case is further futile as to Defendants Mussafer, Glynn, and Michael White, and thus excused.

313.     Demand in this case is further excused because Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Emily White, Michael White, and Zusi are beholden to and controlled by Defendant Mussafer, who is a primary interested wrongdoer who manages Defendant Advent, which is the controlling shareholder of Olaplex and was during the Relevant Period. Indeed, through his control of private equity firm Defendant Advent, Defendants Mussafer collectively owns approximately 76% of the Company's outstanding stock. In light of this control, Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Emily White, Michael White, and Zusi, and non-party Bilbrey cannot impartially consider a demand against Defendant Mussafer, who is an interested, primary wrongdoer, as they are dependent on Defendant Massafer for their continued employment with the Company and the compensation that goes with that employment. Thus, Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Emily White, Michael White, and Zusi, and non-party Bilbrey are unable to evaluate a demand with disinterest or independence given Defendant Mussafer's control over them.

314.     The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. For example, Director-Defendants Morfitt, Mussafer, and Emily White have all served together on the board of Lululemon Athletica, Inc. since 2011, which was the product of another public offering by Defendant Advent. Thus, any demand on the Director-Defendants would be futile.

315.     Further still, Director-Defendants Dagousset, Findlay, Glynn, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi approved the Company's Registration Statement in connection with the Offering of its common stock to investors at prices artificially inflated by their own misconduct. This breach of fiduciary duties has subjected the Company, and all of the Individual Defendants, to a substantial likelihood of liability in the Securities Class Action for violating the Exchange and Securities Act. Therefore, demand in this case is futile as to them, and further excused.

316.    Defendants Morfitt, Gurwitch, and Zusi served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, Defendants Morfitt, Gurwitch, and Zusi were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, and the adequacy of the Company's internal controls over financial reporting. Defendants Morfitt, Gurwitch, and Zusi failed to ensure the integrity of the Company's financial statements and internal controls and failed to adequately exercise their risk management and risk assessment functions, including as it pertained to the Product Safety Misconduct as they were charged to do under the Audit Committee Charter, allowing the Company to participate in the Product Safety Misconduct and to file false and misleading financial statements with the SEC. Thus, Defendants Morfitt, Gurwitch, and Zusi breached their fiduciary duties, are not disinterested, and demand is excused as to them.

317.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to participate in the Product Safety Misconduct, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange and Securities Acts. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner, including by engaging in and/or causing the Company to engage in the Product Safety Misconduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

318.    Olaplex has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Olaplex any part of the damages Olaplex suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

319.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

320.    The acts complained of herein constitute violations of fiduciary duties owed by Olaplex's officers and directors, and these acts are incapable of ratification.

321.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Olaplex. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Olaplex, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

322.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Olaplex to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

323.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

324.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

325.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

326.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

327.    Under the direction and watch of Defendants Findlay, Walden, Michael White, Zusi, Gurwitch, Morfitt, Mussafer, Emily White, Dagousset, Glynn, and Wong, the 2022 Proxy Statement failed to disclose that: (1) Defendants were engaging in and/or causing the Company to engage in the Product Safety Misconduct; (2) Olaplex's Offering was solicited on false and misleading information; (3) Olaplex was not facing the possibility of laws and regulations changing in the future, but was already facing material events that could negatively affect Olaplex's business, operations, prospects, and overall brand reputation; (4) the Company was aware that the E.U. moved to ban lilial in August 2020 after classifying the chemical as a reprotoxic chemical with links to infertility; (5) in response to the E.U.'s

impending lilial ban, Olaplex had already reformulated its No. 3 Hair Perfector product in June 2021 to remove lilial internationally, just mere months before the Offering; (6) despite reformulating No. 3 Hair Perfector to remove lilial, Olaplex chose to retain the old product inventory containing lilial on hand and continued to sell the old inventory for months, at least until January 2022; (7) as a result, the excess inventory put Olaplex, its retailers, and its distributors in a high risk position were the Company to experience a downturn in product sales; (8) Olaplex represented that the Company was highly concerned about their customers' health and well-being and strove to design "clean" products while selling products that contained a reprotoxic chemical with links to infertility; (9) as a result, Olaplex faced serious risks that the Company's brand reputation, especially by and through social media, would be significantly damaged by the E.U.'s lilial ban; and (10) Olaplex failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

328. Defendants Findlay, Walden, Michael White, Zusi, Gurwitch, Morfitt, Mussafer, Emily White, Dagousset, Glynn, and Wong also caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed—as evidenced by Defendants' false and misleading statements referenced herein and Defendants' and/or the Company's engagement in the Product Safety Misconduct; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

329. In the exercise of reasonable care, Defendants Findlay, Walden, Michael White, Zusi, Gurwitch, Morfitt, Mussafer, Emily White, Dagousset, Glynn, and Wong should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy

Statement, including the reelection of Defendants Findlay, Walden, Michael White, and Zusi to the Board and the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2022.

330. The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia*: (1) reelect Defendants Findlay, Walden, Michael White, and Zusi to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2022.

331. The Company was damaged as a result of Defendants Findlay, Walden, Michael White, Zusi, Gurwitch, Morfitt, Mussafer, Emily White, Dagousset, Glynn, and Wong's material misrepresentations and omissions in the 2022 Proxy Statement.

332. Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

333. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

334. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Olaplex's business and affairs.

335. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

336. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Olaplex.

337. In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Product Safety Misconduct and failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

338.     In further breach of their fiduciary duties owed to Olaplex, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendants were engaging in and/or causing the Company to engage in the Product Safety Misconduct; (2) Olaplex's Offering was solicited on false and misleading information; (3) Olaplex was not facing the possibility of laws and regulations changing in the future, but was already facing material events that could negatively affect Olaplex's business, operations, prospects, and overall brand reputation; (4) the Company was aware that the E.U. moved to ban lilial in August 2020 after classifying the chemical as a reprotoxic chemical with links to infertility; (5) in response to the E.U.'s impending lilial ban, Olaplex had already reformulated its No. 3 Hair Perfector product in June 2021 to remove lilial internationally, just mere months before the Offering; (6) despite reformulating No. 3 Hair Perfector to remove lilial, Olaplex chose to retain the old product inventory containing lilial on hand and continued to sell the old inventory for months, at least until January 2022; (7) as a result, the excess inventory put Olaplex, its retailers, and its distributors in a high risk position were the Company to experience a downturn in product sales; (8) Olaplex represented that the Company was highly concerned about their customers' health and well-being and strove to design "clean" products while selling products that contained a reprotoxic chemical with links to infertility; (9) as a result, Olaplex faced serious risks that the Company's brand reputation, especially by and through social media, would be significantly damaged by the E.U.'s lilial ban; and (10) Olaplex failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

339.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

340.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Product Safety Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in

the Product Safety Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Product Safety Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Olaplex's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

341.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

342.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Olaplex has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

343.    Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

344.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

345.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Olaplex.

346.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, repurchases, or similar compensation from Olaplex that was tied to the performance or artificially inflated valuation of Olaplex or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

347.    Plaintiff, as a shareholder and a representative of Olaplex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider

sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

348.    Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

349.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

350.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

351.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

352.    Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

353.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

354.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Olaplex, for which they are legally responsible.

355.    As a direct and proximate result of the Individual Defendants' abuse of control, Olaplex has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Olaplex has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

356.    Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

## SIXTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

357.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

358.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Olaplex in a manner consistent with the operations of a publicly-held corporation.

359.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Olaplex has sustained and will continue to sustain significant damages.

360.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

361.    Plaintiff, on behalf of Olaplex, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

362.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

363.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Olaplex shareholders, in which it is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act.

364.    Federal law provides Olaplex with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

365.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's Offering contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

366.     Olaplex is the registrant for the Offering. Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi were responsible for the contents and dissemination of the Registration Statement.

367.     As issuer of the shares, Olaplex is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

368.     The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

369.     Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi, because of their positions of control and authority as officers and/or directors of Olaplex, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Olaplex, including the wrongful acts complained of herein and in the Securities Class Action.

370.     Accordingly, Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

371.     As such, Olaplex is entitled to receive all appropriate contribution or indemnification from Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, Emily White, Michael White, and Zusi.

## **PRAYER FOR RELIEF**

372.     FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Olaplex, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Olaplex;

(c)     Determining and awarding to Olaplex the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Olaplex and the Individual Defendants to take all necessary actions to reform and improve Olaplex's corporate governance and internal procedures to comply with applicable laws and to protect Olaplex and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Olaplex to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Olaplex restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 15, 2023                    Respectfully submitted,

_/s/_Robert C. Moest
**THE BROWN LAW FIRM, P.C.**

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
           eitank@bgandg.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Carla Ciuffo, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15 day of November, 2023.



DocuSigned by:

*CARLA CIUFFO*

BB8FBA5F51A845A...

Carla Ciuffo